**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES** *ex rel.* **ROBERT MADSEN; STATE OF NEW YORK** *ex rel.* **ROBERT MADSEN; STATE OF CALIFORNIA** *ex rel.* **ROBERT MADSEN; STATE OF DELAWARE** *ex rel.* **ROBERT MADSEN; THE DISTRICT OF COLUMBIA** *ex rel.* **ROBERT MADSEN***;* **STATE OF FLORIDA** *ex rel.* **ROBERT MADSEN; STATE OF HAWAII** *ex rel.* **ROBERT MADSEN; STATE OF ILLINOIS** *ex rel*. **ROBERT MADSEN; STATE OF INDIANA** *ex rel.* **ROBERT MADSEN; COMMONWEALTH OF MASSACHUSETTS** *ex rel.* **ROBERT MADSEN; STATE OF MINNESOTA** *ex rel.* **ROBERT MADSEN; STATE OF MONTANA** *ex rel.* **ROBERT MADSEN; STATE OF NEVADA** *ex rel.* **ROBERT MADSEN; STATE OF NEW HAMPSHIRE** *ex rel.* **ROBERT MADSEN; STATE OF NEW JERSEY** *ex rel.* **ROBERT MADSEN***;* **STATE OF NEW MEXICO** *ex rel.* **ROBERT MADSEN***;* **STATE OF NORTH CAROLINA** *ex rel.* **ROBERT MADSEN; STATE OF OKLAHOMA** *ex rel.* **ROBERT MADSEN; STATE OF RHODE ISLAND** *ex. rel.* **ROBERT MADSEN; STATE OF TENNESSEE** *ex rel.* **ROBERT MADSEN; COMMONWEALTH OF VIRGINIA** *ex rel.* **ROBERT MADSEN, and ROBERT MADSEN individually,** | **CIVIL ACTION NO.** <br><br> **11 CIV 4201** <br><br><br> <u>**FILED UNDER SEAL**</u> <br><br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, <br> v. <br><br> **BANK OF AMERICA, its subsidiaries COUNTRYWIDE FINANCIAL, LANDSAFE APPRAISAL SERVICES, INC, US TRUST; and BNY MELLON,** <br><br> **Defendants.** | |

## THIRD AMENDED COMPLAINT

Plaintiff-Relator ROBERT MADSEN ("Relator"), by and through his undersigned attorneys, LINDA J. STENGLE and KENNEY & McCAFFERTY, P.C., on behalf of the United States of America, the State of New York, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa the Commonwealth Of Massachusetts, the State of Minnesota; the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico; the State of North Carolina; the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the Commonwealth Of Virginia, and ROBERT MADSEN, **individually, on his own behalf**, alleges as follows for his Third Amended Complaint against Defendants BANK OF AMERICA, its subsidiaries COUNTRYWIDE FINANCIAL, US TRUST, and LANDSAFE APPRAISAL, INC.; and BNY MELLON.

## I.  INTRODUCTION

1.  Plaintiff-Relator ROBERT MADSEN brings this qui tam action pursuant to 31 U.S.C. §3729, *et seq.* to recover damages and civil penalties from Defendants Bank of America; its subsidiaries, Countrywide Financial, US Trust, and LandSafe Appraisal Inc.; and BNY Mellon (hereinafter "Defendants"), on behalf of the United States of America and the State of New York for systemically and consistently overvaluing residential properties, thereby causing damage to the United States Treasury through its many programs and to Government Sponsored Entities due to Defendants' practice of overvaluing assets, misleading

shareholders, and providing misleading information about the financial health of the Defendant corporations.

2.    The overvaluation of residential properties was engineered through national and systemic appraisal fraud.

3.    When the Defendants engage in appraisal fraud, the valuation of a particular piece of residential property  - -  the first critical step in the mortgage system - -  is misrepresented to homeowners, investors, insurers, and the governments.

4.    The misrepresentations of residential properties are aggregated and included in the Defendants' financial reports and balance sheets.  The systemic misrepresentation of the value on the balance sheets causes the financial health of the Defendants to be distorted and opaque.  The systemic misrepresentation on financial reports and balance sheets makes the Defendants' appear to be more profitable and financially stable than they really are, causing states to invest pension funds in those entities under the false belief that publically reported financial and investor information is accurate.

5.    The national and systemic misrepresentations of the values of residential properties resulted in Defendants making false claims to numerous government agencies and insurers, including but not limited to the FHA, the Veteran's Administration, TARP, HAMP, Fannie Mae, Freddie Mac, the US Treasury, and to hundreds of state agencies.

6.    Relator alleges that Defendants' improper appraisal practices have caused roughly $6.6 billion dollars in overvaluation of the collateral assets for Bank of America's

non performing loan portfolio and have resulted in regulatory violations that would incur billions of dollars of penalties to the Defendants.

7.   Defendants' acts also constitute violations of the state False Claims Acts, by making false claims and assertions about properties held in each Plaintiff State and misrepresenting the financial health of the Defendant corporations to various and numerous state pension funds for teachers, fire rescue workers, the state judiciary, and other public employees.

8.   The aforementioned State of New York, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Hawaii, the State of Illinois, the State of Indiana, the Commonwealth Of Massachusetts, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the Commonwealth Of Virginia are hereinafter referred to collectively as the "Plaintiff States."  The United States of America and the Plaintiff States are hereinafter collectively referred to as the "Government Plaintiffs."

9.   This matter arises from Defendants' willful and intentional practice of systemically, willfully, knowingly, and intentionally conducting fraudulent residential property appraisals of residential properties, and thousands of fraudulent appraisals being submitted for use with various government programs. For example, Relator found that the practices resulted in REO properties being overvalued by 15 to 40% nationwide.

10.     These fraudulent and misleading appraisals are used by Defendants to qualify Defendants for participation in FHA, Fannie Mae, Freddie Mac, VA, TARP, HAMP, and other federal funding programs.

11.     Defendants' flawed appraisal practices result in fraudulent appraisals being submitted to all business lines of all Bank of America lending operations including providing fraudulent loan documentation for the FHA, the VA, and conventional mortgage insurers. In other words, misleading and false appraisals are relied upon by HUD, VA and Government Sponsored Entities Fannie Mae and Freddie Mac who insure and/or purchase the mortgages on the secondary market with government backing.

12.      The misleading and overvalued appraisals are also used to reduce Defendants' reserve obligations for the Federal Reserve through inflating loan to value figures.

13.     In the State of New York, additional violations fall under the New York Martin Act because Defendants' conduct misrepresents the financial health of the Defendants to shareholders, among other securities violations. Specifically, the defendants defrauded New York State and City governmental entities that invested in them believing their balance sheets represented their true fiscal health when, in fact, balance sheet references incorporate improperly and unlawfully overvalued  residential appraisals.

14.     These improper and overvalued appraisals are submitted to various government programs, such as the FHA, conventional financing programs, and the VA.  This practice has  subjected Defendants to the significant and material liability of

having to buy back loans sold to the government those applications for funds were submitted to the government through fraudulent loan documentation.

15.    Had state government entities known that Defendants were overvaluing assets to such a degree, such entities would not have invested in the Defendants.

16.    New York State and City governmental entities with investments in the Defendants include the New York City Employee's Retirement System; the Teachers' Retirement System of the City of New York; the New York City Police Pension Fund; the New York City Fire Department Pension Fund; the New York City Board of Education Retirement System; the New York City Police Officers' Variable Supplements Fund; the New York City Police Superior Officers' Variable Supplements Fund; the New York City Firefighters' Variable Supplements Fund; the New York City Fire Officers' Variable Supplements Fund; Teachers' Retirement System of the City of New York Variable Annuity Funds; the City of New York Group Trust; and the New York City Deferred Compensation Plan.

17.    Similar to the misrepresentation to the State of New York's public employee pension funds, all of the Plaintiff States have suffered damages and losses to their numerous and various public employee pension funds due to Defendants' wrongdoing.  The Plaintiff States have all invested pension funds in the defendants. Had the Plaintiff States known that Defendants were overvaluing assets to such a degree, such public funds would not have invested in the Defendants.

18.     In the State of California, the relevant state pension funds include CalPERS, the California State Teachers' Retirement System, the Department of Personnel Administration – State Savings Plus Program, the University of California Retirement Plan, California PERF, California Teachers, San Diego County pension fund, and the pension funds for San Francisco City and State, among others.  These funds invested heavily in the Defendants.

19.     In the State of Delaware, the relevant state pension funds include the Delaware Public Employees' Retirement System, which consists of nine retirement plans for various public employees, and three commingled pension funds.  These funds invested heavily in the Defendants.

20.     In the District of Columbia, the relevant pension funds include the District of Columbia Police & Fire, and the District of Columbia Teachers pension funds. These funds invested heavily in the Defendants.

21.     In the State of Florida, the relevant funds are consolidated through the Florida Division of Retirement and the Florida Retirement System. These funds invested heavily in the Defendants.

22.     In the State of Hawaii, the relevant funds are managed through Hawaii ER.  The state of Hawaii's pension fund is projected to be wiped out by the year 2020.  In 2021, the fund will require an infusion of $1.7 billion to make its payments to state beneficiaries.  The Hawaii retirement system has been ranked fifth in the country of state pension funds most damaged by the changes in the economy. These funds managed through Hawaii ER invested heavily in the Defendants.

23.     In the State of Illinois, the relevant pension funds are the State Retirement
Systems of Illinois, the State Universities Retirement System of Illinois, the
Chicago Teachers fund, the Illinois Municipal employees' fund, Illinois SERS,
the Illinois Teachers Retirement Fund, the Illinois Public Employees' Retirement
Fund, and the Illinois Universities' fund.  These funds invested heavily in the
Defendants.  Illinois is ranked first in the list of states most damaged by the
changes in the economy.  The pension funds are expected to run out of money in
the year 2018.  Illinois will require an infusion of $13.6 billion in 2019 in order to
make payments to state fund beneficiaries.

24.     In the State of Indiana, the relevant funds include the Indiana Public Employees'
Retirement Fund and the Indiana Teachers' Retirement Fund.  Indiana is ranked
third in the list of states most damaged by changes in the economy.  Indiana's
pension funds are expected to run out of money in the year 2019.  Indiana will
require an infusion of $3.6 billion in 2020 in order to make payments to state fund
beneficiaries.

25.     In the Commonwealth of Massachusetts, the relevant funds are the Massachusetts
Pension Reserves Investment Trust Fund, the Massachusetts Teachers'
Retirement Board, and Massachusetts SERS, among others.   These funds
invested heavily in the Defendants.

26.     In the State of Minnesota, the relevant funds include the Minnesota Public
Employee Retirement Association, the Minnesota Teachers' Retirement
Association, the Minneapolis ERF, the Minnesota PERF, the Minnesota State

Employees' fund, and the Minnesota Teachers' fund.  These funds invested heavily in the Defendants.

27.     In the State of Nevada, relevant funds include the Nevada Public Employees Retirement System, the Nevada Police Officer and Firefighter fund, and the Nevada Regular Employees' fund, among others.  These funds invested heavily in the Defendants.

28.     In the State of New Hampshire, the relevant funds are managed through the New Hampshire Retirement System.  New Hampshire ranks #11 in the number of state pension funds most damaged by changes in the economy.  New Hampshire's Retirement System is expected to run out of funds in 2022.  In the year 2023, the System will require an infusion of a billion dollars to pay state beneficiaries. The System invested heavily in the Defendants.

29.     In the State of New Jersey, the relevant funds include the New Jersey Division of Pensions and Benefits, New Jersey PERS PUC, New Jersey Police and Fire, and the New Jersey Teachers' fund.  These funds invested heavily in the Defendants. New Jersey ranks #4 on the list of state pension funds most damaged by changes in the economy.  The funds are expected to run out of money in the year 2019.  In the year 2020, the state will need an infusion of $14.4 billion into its fund to enable it to continue paying state fund beneficiaries.

30.     In the State of New Mexico, the relevant funds include the New Mexico Education Retirement Board, which manages pensions, the Public Employees Retirement Association of New Mexico, and the New Mexico Teachers fund, among others.  These funds invested heavily in the Defendants.

31.    In the State of North Carolina, the relevant funds include North Carolina Local

Government's pension fund and the North Carolina Teachers and State

Employees fund.  These funds invested heavily in the Defendants.

32.    In the State of Oklahoma, the relevant funds are managed by the Oklahoma City

Public Employees Retirement System and the Oklahoma Teachers Retirement

System.  Oklahoma ranks #7 on the list of state pension funds most damaged by

changes in the economy.  The Oklahoma funds are expected to run out of money

by the year 2020.  In the year 2021, the funds will require an infusion of $3.7

billion in order to pay fund beneficiaries.  These funds invested heavily in the

Defendants.

33.    In the State of Rhode Island, the relevant funds are managed by the Employees'

Retirement System and include Rhode Island Municipal, among other funds.

These funds invested heavily in the Defendants.

34.    In the State of Tennessee, the relevant funds include the Tennessee Pension

Funds, the Consolidated Retirement System, Tennessee Political, and Tennessee

State and Teachers funds, among others.  These funds invested heavily in the

Defendants.

35.    In the Commonwealth of Virginia, the state pension funds are managed by the

Virginia Retirement System.  The System invested heavily in the Defendants.

## II.       JURISDICTION AND VENUE

36.    This Court has jurisdiction over the subject matter of this action: (i) pursuant to 31

U.S.C. §3732, which specifically confers jurisdiction on this Court for actions

brought pursuant to 31 U.S.C. §§3729 and 3730; (ii) pursuant to 28 U.S.C. §1331,

which confers federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. §1345, because the United States is a plaintiff.

37.    This Court has jurisdiction over Defendants under 31 U.S.C. §3732(a) because Defendants can be found in, are authorized to transact business in, and are now transacting business in this District.  In addition, acts proscribed by 31 U.S.C. §3729 have occurred in this District.

38.    Jurisdiction over all state law claims alleged herein is proper under 31 U.S.C.§3732(b).  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C §1367.

39.    Relator Madsen has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided notice of this action to the government before filing this *qui tam* action.

40.    Relator Madsen has previously provided to the Attorney General of the United States through Robert Snodgrass, an FBI agent in the Government's Sacramento office, a disclosure statement in excess of 900 pages, summarizing known material evidence and information related to his original complaint, and his First Amended, Second Amended and Third Amended Complaints, in accordance with the provisions of 31 U.S.C. §3730(b)(2).  Relator Madsen's disclosure statement is supported by material evidence.  Relator Madsen notified Robert Snodgrass of his intention to file this Third Amended Complaint.

41.    Relator Madsen has already provided the governments with a relator statement, a supplemental relator statement, and several specific examples of documents

supporting his allegations.   These relator statements are hereby incorporated within this Third Amended Complaint by reference.

42.    Venue is proper in the District because Defendants conduct business in this District and acts giving rise to this action originated within this District.  For example, Defendant BNY Mellon is headquartered at One Wall Street, New York, NY 10286.

43.    All Defendants conduct business in the Southern District of New York.

44.    Moreover, numerous New York entities, as well as the interests of the State of New York and the City of New York were harmed by the Defendants' conduct within the City and State of New York.

### III.    PARTIES

45.    Plaintiff-Relator Robert Madsen is a resident of the state of California.  Relator Madsen brings this action on his own behalf and on behalf of the federal and state governments pursuant to 31 U.S.C. §3730(b)(1) for false and fraudulent claims submitted to federally-funded programs, including the United States Treasury, the Troubled Assets Recovery Program, Freddie Mac, Fannie Mae, and the Federal Reserve.

46.    Defendant Bank of America, at all times material to this Third Amended Complaint, acted through its agents and employees who, at all times, were acting within the scope of their agency and employment

47.    Defendant Countrywide Financial Services Corp. was purchased by Bank of America in 2008, with the assistance of federal dollars, and this purchase has allowed Bank of America to continue to avail itself of federal assistance in the

form of TARP, stimulus, HAMP, and other ARRA dollars. Defendant

Countrywide is and has been owned by Bank of America and is included in all

references to Bank of America for purposes of this Third Amended Complaint.

48. Defendant US Trust is wholly owned by Bank of America and is included in all

references to Bank of America for purposes of this Third Amended Complaint.

49. Defendant LandSafe Appraisal Service is a national provider of real estate

valuation and appraisal services for Bank of America.  It is wholly owned by

Bank of America, and LandSafe employees receive paychecks issued from Bank

of America. LandSafe is located at 7105 Corporate Drive in Plano, Texas.

50. Defendant BNY Mellon was formerly known as the Bank of New York and is

located at One Wall Street, New York, NY 10286.  LandSafe provides appraisals

for BNY Mellon properties in the same manner as it does for Bank of America.

51. New York State and City governmental entities with investments in the

defendants include the New York City Employee's Retirement System; the

Teachers' Retirement System of the City of New York; the New York City Police

Pension Fund; the New York City Fire Department Pension Fund; the New York

City Board of Education Retirement System; the New York City Police Officers'

Variable Supplements Fund; the New York City Police Superior Officers'

Variable Supplements Fund; the New York City Firefighters' Variable

Supplements Fund; the New York City Fire Officers' Variable Supplements

Fund; Teachers' Retirement System of the City of New York Variable Annuity

Funds; the City of New York Group Trust; and the New York City Deferred

Compensation Plan (collectively "the Funds").  The Funds are funds that provide

pension and other benefits to hundreds of thousands of current and former employees of the City of New York.

52.    For the other Plaintiff States, the relevant funds are those identified in paragraphs 8 through 25 above.  These funds invested heavily in the defendants and have been damaged by Defendants' wrongful conduct.

53.    Since 2007, Plaintiff-Relator Madsen has been employed by Defendants as an appraiser of real property.  The Relator is currently employed as a licensed appraiser, and he appraises real estate property in the greater Sacramento Metropolitan area.  Approximately 85% of Relator's current workload involves using a valuation product known as an REO appraisal.  This product is used to value at-risk and/or bank owned (by way of foreclosure) residential properties

54.    The other 20% of Relator's work load is comprised of completing appraisals for refinance and purchase transactions

55.    In his capacity as an appraiser, Relator has learned that Defendants have created and submitted fraudulent appraisals resulting in fraudulent loan documentation in order to defraud government programs as referenced more specifically throughout this Third Amended Complaint.

56.    REO valuations are a suite of valuation report products that are used to obtain an opinion of market values for at "at-risk" real estate. "At-risk: means:

   a)   the client suspects the collateral may not be worth as much as the loan balance, or

   b)   the borrower is in some stage of default on their loan (behind on payments), or

c) the borrower has completely defaulted on the loan and the bank has either begun or completed the foreclosure process.

    i. Title to the real estate in question may or may not be held in the lender's name.

57. In general, REO valuations are used to derive multiple values for the property based on different scenarios as requested by the client.  These scenarios generally are:

a) As-Is value based on a normal marketing time. The value of the property is determined by an appraiser for the property as it exists… warts and all.  The valuation takes into account all damages and wear and tear on the property to determine how much the market would be willing to pay for the property given its current condition. This scenario assumes a normal amount of time is allowed for exposing subject to potential buyers.

b) As – Repaired value based on a normal marketing time.  In this scenario, the amount is based on an opinion of how much the property would sell for if required repairs are completed, the house is spruced up, and the property is given enough time on the market to be properly exposed to potential buyers.

c) As –Is based on a limited marketing time.  The often used scenario is premised on the understanding that the property must sell within a limited marketing time. With LandSafe, this limited marketing time is set at under 30 days.   Generally, selling a property in a limited amount of time involves significant discounting to achieve.

d) As-Repaired based on a limited marketing time.  This is substantially like an As Is scenario but makes assumptions about repairs as described in the As-

15

Repaired value described above.  This scenario differs through its

assumption that the property must sell within a limited time.

These four values are used by the client to make a decision as to whether to sell the property quickly or hold out for more money.  They are also used to determine whether it makes sense (monetarily) for the bank to repair the property or to sell it like it is.

58.    In his capacity as an appraiser, Relator Madsen obtained direct knowledge, information, and belief that Defendants engaged in schemes to defraud the Funds, the  United States Treasury, FHA, VA, TARP, HAMP, FDICIA, Fannie Mae, Freddie Mac, the Federal Reserve, and other federal programs through significant overvaluation of residential properties in violation of recognized valuation methodology as required by the Uniform Standards of Professional Appraisal Practice (USPAP) techniques and through manipulation of "Shadow Inventory."

59.    Shadow inventory is a term that refers to real estate properties that are either in foreclosure and have not yet been sold or homes that owners are delaying putting on the market until prices improve.  Shadow inventory creates uncertainty about when the market can expect a full recovery.  Shadow inventory typically causes data on housing inventory to understate the actual number of inventory available for purchase.

60.    Further, in the course of his employment with Defendants, Relator Madsen obtained direct knowledge, information, and belief that Defendants created, submitted, and accepted reimbursement for false claims, in whole or in part by the United States government and/or the Plaintiff States via the Funds. Relator

Madsen is an original source of this information to the governments, and he has initiated this *qui tam* action against the Defendants on his own behalf and on behalf of the United States government pursuant to 31 U.S.C. §3730(b)(1) and the governments of the Plaintiff State pursuant to the analogous laws of the Plaintiff State.

61.   All unlawful practices alleged in this Third Amended Complaint were established and/or ratified at the highest corporate levels of Defendants (or their successors) and subsidiaries and affiliates owned, operated, dominated and controlled by BOA, including Defendant Countrywide, Defendant US Trust, and Defendant LandSafe.

62.   Defendant BNY Mellon had independent obligations to provide the government plaintiffs with conforming and reliable appraisals of its residential properties. Through its contract with LandSafe, Defendant BNY Mellon also submitted false information about the value of residential property to the plaintiff governments through improper and misleading residential appraisals.

63.   Defendants are liable in this action because of the actions of their own employees and agents and/or because Defendants are legally responsible for the actions of their predecessors, subsidiaries and affiliates.

64.   Through Bank of America's use of LandSafe to provide valuation services to its correspondent lending programs, the same fraudulent appraisal practices and misleading loan documentation violations have spread through other banks and lending institutions.

      a.   Defendants' Correspondent Lending services utilized the same appraiser pool as Defendants' in house lending services.

      b.   Defendants' Correspondent Lending services used the same appraisal review apparatus as the Defendants' in house lending services.

65.   Because Defendants' fraudulent appraisal systems were used for both in house and correspondent lending services, these systems introduced and spread the same fraudulent lending activity to these external lending systems as exists within the Bank of America lending systems.  In other words, Defendants' fraudulent appraisals travel through the entire residential financing system and extend the same risks to the FHA, the VA, etc.

## IV.   THE IMPORTANCE OF ACCURATE APPRAISALS TO THE GOVERNMENT

66.   During all time periods relevant to this Third Amended Complaint, Bank of America is one of the largest mortgage lenders in the United States. Accurate appraisals of Defendants' REO properties are a critical financial indicator of the financial health of Defendants.  The Plaintiff State Pension Funds (hereinafter collectively referred to as "Funds"), and the Federal Government, through its many agencies and Government Sponsored Entities, rely on Defendants, and others, to provide accurate information about their financial health so that the Funds can best serve state employees and the Federal Government can judge how to best ensure a stable economy and to protect the investments of the government, the taxpayers, and shareholders in Defendant companies. The Funds and the federal government depended on Defendants' appraisers to fairly, accurately, and competently assess the residential property values that served as collateral for its

loans. Some of those agencies include the US Treasury, HUD, the FHA, the VA, TARP, HAMP, Fannie Mae and Freddie Mac, among others.

67.     Defendants are required by their primary banking regulators, the OCC and OTS, to maintain an appropriate real estate appraisal program for all of their lending functions. The independence and competence of the real estate appraisers who determine the value of home loan collateral is of enormous importance in the mortgage industry. Real estate appraisals are intended to provide lenders with an independent and accurate valuation of the market value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects lenders and investors from losses if the borrower defaults on the loan.

68.     In addition, independent and competent appraisals protect secondary mortgage market investors and insurers, i.e. Fannie Mae, Freddie Mac, and the FHA, from purchasing notes on properties that are under-collateralized or at likely risk of default.

69.     Because of the importance of appraisals in the financial market, state and federal statutes and regulations require that appraisals be accurate and be prepared independent of a vested financial interest in the subject property. In order to achieve these goals, federal statutes and regulations, and most state statutes and regulations, implement USPAP in its entirety to standardize how appraisals are to be properly prepared. USPAP is promulgated by the Appraisal Standards Board of The Appraisal Foundation, which "develops, publishes, interprets, and amends USPAP on behalf of appraisers and users of appraisals services."

70.    Congress authorized the Appraisal Foundation as the source of Appraisal
       Standards and Appraiser Qualifications.

71.    Defendants are required by the HUD, the FHA, the VA, Fannie Mae, and Freddie
       Mac to produce appraisals in full compliance with USPAP standards. In addition,
       Defendants' letters of engagement specifically require compliance with USPAP
       and all Fannie Mae requirements.

72.    In fact, LandSafe generates appraisals on Fannie Mae and Freddie Mac USPAP
       compliant forms.  The most common form used is known as the Freddie Mac
       Form 70 and the Fannie Mae 1004.  These forms are otherwise known as the
       Uniform Residential Appraisal Report ("URAR").

73.    Defendants cause URARs to be fraudulent and misleading.  Those same URARs
       are submitted to many government agencies, such as Fannie Mae, Freddie Mac,
       HUD, the VA, and the FHA.

74.    The URAR form was introduced in 1986.  Agreement on the URAR was the first
       time all government agencies agreed to adopt one standard form for all mortgage
       activities.  The form is used by appraisers to determine home appraisal values.

75.    The URAR was adopted to minimize variations in reporting appraisal information
       and to increase consistency in the way appraisers determined residential property
       value.

76.    This form, the URAR, continues to be the industry standard for one unit
       residential appraisals and is used in all fifty states across the country.

77.    The governments, the public, and the entire mortgage industry rely on the URAR
       to be accurate and complete.

78.     In the mortgage industry, the very presence of the URAR implies, among other

things, that the subject property described therein, may qualify for conventional

mortgage financing.

79.     The majority of Defendants' appraisal volume is a product known as an REO

valuation.   REO valuations are used to determine an opinion of market value for

short sale and foreclosed properties (at risk collateral) and to analyze the

feasibility of required repairs and various marketing times for the subject

property.

80.     Furthermore, the letter of engagement document for each REO valuation

assignment instructs:

> 'The intended use of this appraisal is for a conventional loan"  and
> "Intended Use: The appraisal will be used: as the basis to set the asking
> price for the subject property for its disposal as an REO property and to
> determine the financial feasibility of making repairs or to evaluate a Short
> Sale transaction. ***The appraisal may also be used for mortgage lending
> purposes.*** (Emphasis added.)

81.     USPAP (2010-2011 version) includes the following standards, among others:

> Ethics: an appraiser must perform assignments ethically and competently, in
> accordance with USPAP and any supplemental standards agreed to by the
> appraiser in accepting the assignment. ... An appraiser must perform
> assignments with impartiality, objectivity, and independence, and without
> accommodation of personal interest; an appraiser must not accept an
> assignment that includes the reporting of predetermined opinions and
> conclusions.

> Standards Rule 1-1(b). The appraiser must not render appraisal services in a
> careless or negligent manner, such as by making a series of errors, that,
> although might not significantly affect the results of an appraisal, in the
> aggregate affects the credibility of those results.

> Standards Rule 1-4. Based on the type of valuation method used, the
> appraiser must collect data necessary for credible results.

> Standards Rule 2:  In reporting the results of a real property appraisal, an
> appraiser must communicate each analysis, opinion, and conclusion in a

manner that is not misleading.

Standards Rule 2-1 Each written or oral real property appraisal report must:
(a) clearly and accurately set forth the appraisal in a manner that will not be misleading;
(b) contain sufficient information to enable the intended users of the appraisal to understand the report properly; and
(c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment.

Standard 2-2(b)(x) [The report must] clearly and conspicuously:

- State all extraordinary assumptions and hypothetical conditions; and
- State that their use might have affected the assignment results; and
- (xi) include a signed certification in accordance with Standards Rule 2-3

82. Many federal statutes and regulations incorporate USPAP directly. For example, 12 C.F.R. § 564.4(a) requires all appraisals to conform to generally accepted appraisal standards as evidenced by USPAP. Section 1110 of FIRREA (12 U.S.C. § 3339) likewise requires that real estate appraisals be performed according to certain minimum standards, which include those identified under 12 C.F.R. § 564.4. In addition to standards established in USPAP, the Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Guide") identifies unacceptable appraisal practices. Specifically Section B4-1.1 (as quoted below)

**"Examples of Unacceptable Appraisal Practices**

The following are examples of unacceptable appraisal practices:
- Development of and/or reporting an opinion of market value that is not supportable by market data or is misleading.
- Development of a valuation conclusion based either partially or completely on the sex, race, color, religion, handicap, national origin, familial status, or other protected classes of either the prospective owners or occupants of the subject property or the present owners or occupants of the properties in the vicinity of the subject property.

- Development of a valuation conclusion based on factors that local, state, or federal law designate as discriminatory, and thus, prohibited.
- Misrepresentation of the physical characteristics of the subject property, improvements, or comparable sales.
- Failure to comment on negative factors with respect to the subject neighborhood, the subject property, or proximity of the subject property to adverse influences.
- Failure to adequately analyze and report any current contract of sale, option, offering, or listing of the subject property and the prior sales of the subject property and the comparable sales
- Selection and use of inappropriate comparable sales.
- Failure to use comparable sales that are the most locationally and physically similar to the subject property."

83. In addition to identifying these specific unacceptable practices, the Freddie Mac Guide and Fannie Mae rules also require full compliance with USPAP.  In all cases of properties that are assumed to qualify for conventional mortgage financing, the appraisal must provide an estimated value of the real property based on replacement costs (where applicable), sales of comparable properties, and future income from income producing properties (where applicable).

84. Specifically, LandSafe's appraisal services are required to conform to USPAP and to Appraisal Standards of Fannie Mae (FNMA), Freddie Mac (FHLMC), and other investors, as applicable

85. LandSafe appraisals must be in compliance not only with USPAP, but also with FIRREA, all appraisal regulations set forth in 12 C.F.R. § 564, et seq. (which includes USPAP), and related appraisal guidance from the OCC and/or OTS.

86. LandSafe agrees in writing to conform to USPAP and relevant appraisal state laws as codified in all the states in which LandSafe conducts appraisal services. USPAP is codified within federal and state law. For example, in California, LandSafe agrees via written contract to abide by relevant appraisal laws and

regulations as dictated by California's Office of Real Estate Appraisers "OREA." LandSafe, as a provider of appraisal services, also has an obligation to perform appraisals in accordance with applicable professional standards in the appraisal management industry.

87.   Because of these contractual obligations and independent regulatory requirements, Defendants are required to ensure the qualifications of their appraisers and to guarantee their appraisers' work. (FNMA Selling Guide Section B4) Any appraisers LandSafe employed or contracted to perform Appraisal Services have to possess the appropriate license or certificate needed to perform the appraisal and also must have the experience and competence necessary to complete the assignment. Ensuring such qualifications should have been equally important to LandSafe because LandSafe is required to guarantee the quality of each appraisal performed.

88.   Defendants also owed a duty to exercise reasonable care in the course of providing appraisal services of residential properties that would be underwritten and otherwise guaranteed by the government. The standard of care owed by LandSafe is embodied in USPAP, by contractual agreement with individual states, the FHA, HUD, the VA, and with Government Sponsored Entities (hereinafter "GSE,") applicable federal and state standards and regulations, and applicable industry standards.

89.   The violations described herein constitute breaches of those written contracts by Defendants.

90.   Each of the appraisals provided or approved by LandSafe contains specific

representations regarding compliance with these standards, including the
following:

a)    The appraiser, at a minimum, developed and reported the appraisal
in accordance with the scope of work requirements stated in the
appraisal report

b)    The appraiser reported the condition of the improvements in
factual, specific terms. The appraiser identified and reported the
physical deficiencies that could affect the livability, soundness, or
structural integrity of the property;

c)    The appraiser performed this appraisal in accordance with the
requirements of USPAP;

d)    The appraiser developed his opinion of the market value of the real
property that is the subject of this report based on the sales
comparison approach to value.

e)    The appraiser used adequate comparable market data to develop a
reliable sales comparison approach for this assignment; The
appraiser researched, verified, analyzed, and minimum of one year
prior to the date of sale of the comparable sale, unless otherwise
indicated in the report;

f)    The appraiser selected and used comparable sales that are
locationally, physically, and functionally the most similar to the
subject property;

g)      The appraiser reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales;

h)      The appraiser verified from a disinterested source, all information in this report that was provided by the parties;

i)      The appraiser represented that he was aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located;

j)      The appraiser has taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. The appraiser has noted in this appraisal report any adverse conditions observed during the inspection of the subject property or that the appraiser became aware of during the research involved in performing this appraisal. The appraiser has considered these adverse conditions in the analysis of the property value, and has reported the effect of the conditions on the value and marketability of the subject property; and

k)      The appraiser represented that any intentional or negligent misrepresentation(s) contained in this appraisal report may result in

civil liability....

91.     LandSafe provided appraisal services to Defendants from at least 2006 through

        the writing of this Third Amended Complaint and for the foreseeable future. As

        of January 31, 2012, LandSafe will no longer be providing appraisal services

        for non BofA transactions.  In other words, as of January 31, 2012, LandSafe

        will exclusively be providing appraisals for Bank of America collateral and

        Bank of America-originated mortgages.

**Fannie Mae and Freddie Mac**

92.     Fannie Mae is a government-sponsored enterprise (GSE) chartered by Congress

        with a mission to provide liquidity, stability, and affordability to the U.S. housing

        and mortgage markets.

93.     Fannie Mae operates in the U.S. secondary mortgage market.  Rather than

        making home loans directly to consumers, Fannie Mae works with mortgage

        bankers, brokers, and other primary mortgage market partners to help ensure that

        they have funds to lend to home buyers at affordable rates.  Fannie Mae funds

        mortgage investments by issuing debt securities in the domestic and international

        capital markets.

94.     Fannie Mae was established as a federal agency in 1938 and was chartered by

        Congress in 1968 as a private shareholder-owned company.  On September 6,

        2008, the Federal Housing Finance Agency was appointed to be conservator of

        Fannie Mae.

95.     Also in September 2008, Fannie Mae entered into an agreement with the US

Department of Treasury through which the Treasury would provide Fannie Mae

with capital as needed to correct any net deficiencies it recorded in any quarter

from September 2008 through 2012.

96.    The September 2008 agreement was intended to ensure that Fannie Mae would

be able to continue providing liquidity and stability to the housing and mortgage

markets.

97.    Fannie Mae has three lines of business – Single-Family, Multi-Family, and

Capital Markets – that provide products and services to lenders and housing

partners.  The three businesses contribute to the company's chartered mission to

increase the amount of funds available in order to make homeownership and

rental housing more available and affordable.

98.    Similar to Fannie Mae, Congress created Freddie Mac in 1970 to provide

liquidity, stability, and affordability to the US housing markets in all parts of the

country and in all economic conditions.

99.    In 2009, Freddie Mac was placed into conservatorship (under FHFA) and given

significant financial assistance by the federal government to continue its role.

100.   Fannie Mae and Freddie Mac both insist on "responsible lending."  They rely on

the Defendants to ensure that the initial loans made to homeowners are based on

conventional financing risks.  Because Fannie Mae and Freddie Mac both

guarantee home purchases with government funding, it is critical that Defendants

be candid and forthright about the value of the properties defendants assert as

qualifying for conventional financing.

101.   Despite repeated government bailouts, Fannie Mae and Freddie Mac continue to hemorrhage cash, while increasing their government borrowings. <u>Fannie Mae posted a third-quarter net loss of $5.1 billion</u> and borrowed an additional $7.8 billion from the U.S. Treasury, bringing the government's preferred stake in the company to $112.6 billion.

102.   Freddie Mac reported a <u>$4.4 billion third-quarter net loss</u>, with additional government borrowings of $6.0 billion, to bring the government's preferred stake in the company to $72.2 billion.

**The Federal Housing Administration**

103.   The Federal Housing Administration, generally known as "FHA", provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories. FHA insures mortgages on single family and multifamily homes including manufactured homes and hospitals. It is the largest insurer of mortgages in the world, insuring over 34 million properties since its inception in 1934.FHA mortgage insurance provides lenders with protection against losses as the result of homeowners defaulting on their mortgage loans. The lenders bear less risk because FHA will pay a claim to the lender in the event of a homeowner's default. Loans must meet certain requirements established by FHA to qualify for insurance.

104.   Unlike conventional loans that adhere to strict underwriting guidelines, FHA-insured loans require very little cash investment to close a loan. There is more flexibility in calculating household income and payment ratios. The cost of the mortgage insurance is passed along to the homeowner and typically is included in the monthly

payment. In most cases, the insurance cost to the homeowner will drop off after five years or when the remaining balance on the loan is 78 percent of the value of the property -whichever is longer.During the 1940s, FHA programs helped finance military housing and homes for returning veterans and their families after the war.

105.    In the 1950s, 1960s and 1970s, the FHA helped to spark the production of millions of units of privately-owned apartments for elderly, handicapped, and lower income Americans.

106.    The FHA and HUD have insured over 34 million home mortgages and 47,205 multifamily project mortgages since 1934. FHA currently has 4.8 million insured single family mortgages and 13,000 insured multifamily projects in its portfolio.

107.    Similar responsibilities of duty and care are owed to FHA by way of documents and covenants similar to those owed to Fannie Mae and Freddie Mac.

**The Federal Reserve**

108.    The Federal Reserve assesses aggregates of values of individual properties identified on the Fannie Mae 1004 and Freddie Mac 70 forms to determine how much money an insured bank needs to place in reserve in case of default.  The higher the Defendants' assets are valued, the lower the amount that needs to be placed in reserve by the Defendants.

109.    Because Defendants would rather not tie their money up by having it held in reserve, they are motivated to report high values for their assets, which would lower the amount that the Federal Reserve identifies as needing to be placed in reserve.

110.    The Defendants have a profit incentive to evaluate the amount of money that

could have been obtained if dollars were lent to a customer instead of placing the same amount of money into reserve as required by the federal government. Because the financial yield is greater for money lent than for money placed in reserve, the Defendants choose to limit the amount placed in reserve to the greatest extent possible.

111.   Defendants, by overvaluing their at risk properties, represent to the Federal Reserve that they have assets that are higher in worth than the amount they would be valued using a realistic *market based* appraisal of the collateral properties.  Through the use of these defective appraisals, the Federal Reserve does not, therefore, require sufficient reserve amounts to securitize the at-risk collateral. Because of overstated appraisal values, the Federal Reserve underestimates the banks' risk (as reported by the defendants' improperly generated appraisals reported on Fannie Mae, FHA, VA, and Freddie Mac forms) which results in higher amounts of liquid funds available for the bank to use to generate profit.  Because of these inflated values on the GSE forms, the reserve required by the government is dangerously lower than it should be.

112.   In short, because of the underfunding of the reserve account, the Defendants have greater amounts of liquid funding for profit making ventures than they would have if they had submitted properly determined valuations of real estate via Freddie Mac and Fannie Mae forms.

## **STATUTES TO COMBAT MORTGAGE FRAUD**

**The Financial Institutions Reform, Recovery And Enforcement Act Of 1989 ("FIRREA")**

113.    With the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Congress endorsed and greatly expanded the Federal Reserve Board's authority to assess civil money penalties to include assessment for the violation of: (1) *any* law, rule or regulation; (2) a final or temporary order, including a cease and desist, suspension, removal, or prohibition order; (3) a condition imposed in writing in connection with the granting of approval of any application or other request; and (4) a written agreement.

114.    Civil money penalties may also be assessed, under FIRREA, for recklessly engaging in an unsafe or unsound practice or a breach of fiduciary duty that results in loss to the institution or gain to the individual. In addition, FIRREA expanded the Federal Reserve Board's authority to assess penalties against any "institution-affiliated party," including any officer, director, employee, controlling stockholder, agent, and any shareholder who participates in the conduct of the affairs of the institution, as well as any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in a law or regulation violation or unsafe or unsound practice that causes more than a minimal financial loss to the institution.

115.    FIRREA also increased the dollar amount of penalties through a three-tiered framework. A first-tier penalty of up to $5,000 per day may be assessed for any violation of law, rule or regulation, final order, condition imposed in writing or written agreement. A second-tier fine of up to $25,000 per day may be assessed for any violation of law or regulation or for any reckless unsafe or unsound practice or for a breach of fiduciary duty that has caused loss to the institution or

gain to the individual. A third-tier fine of up to $1,000,000 per day may be assessed for any knowing or reckless violation of law or regulation, participation in an unsafe or unsound practice or breach of fiduciary that causes substantial loss to the institution or gain to the individual.

116.     In addition, the Board may assess fines of up to $25,000 per day for any violation of the Bank Holding Company Act of 1956, as amended, and may assess fines ranging from $2,000 per day to $1,000,000 per day for failure to make, submit or publish required regulatory reports or for the filing of false or misleading reports (e.g., Call Reports and FR Forms Y-6 and Y-9).

The Civil Monetary Penalty Matrix Appears Below.

Note: Boxes on the Matrix (including the empty boxes) should be used to reflect progressive levels of severity.

| | 0 | 1 | 2 | 3 | 4 | Weight Factor | Final Figure |
|---|---|---|---|---|---|---|---|
| Intent | No | | Should Have Known | | Clear Intent | 5 | |
| Pecuniary gain or other benefit to IAP or Related Interest | No | | | Indirect Benfit to IAP or Related Interest | Direct Benefit to IAP or Related Interest | 4 | |
| Prev. Admin. Action or Criticism | None | Prev. Criticism for Similar Violation | Violation or Criticism on Point Cited in Report | Prior Letter or MOU on Point | C&D, Agreement, or Condition in Writing on Point | 3 | |
| History | None | Unrelated | At Least | Several | Frequent | 2 | |

| | | Prior Violations | One Similar Violation | Similar Violations | Similar Violations | | |
|---|---|---|---|---|---|---|---|
| Loss or Risk of Loss | No Loss and No Risk of Loss | No Loss or Minimal Risk | Minimal Loss or Moderate Risk | | Substantial Actual or Potential Loss | 6 | |
| Number of Violations at Issue | | | | | Numerous Violations | 2 | |
| Duration of Violation Prior to Notification | | | | | Violation Outstanding for Long Period | 2 | |
| Continuation after Notification | Violation Ceased Prior to Notification | Violation Ceased Immed. Upon Notification | | Violation Continued for Period of Time After Notification | Violation still Continuing | 3 | |
| Concealment | None | | | Purposely Complicated Transaction to Make It Difficult to Uncover | Active Concealment | 5 | |
| Impact | No Impact on Institution or Banking Industry | | Substantial Impact on Institution; No Impact on Banking Industry | Moderate Impact on Banking Industry or on Public Perception of Banking Industry | Substantial Impact on Banking Industry or on Public Perception of Banking Industry | 6 | |
| Loss or Harm to Consumers (where applicable) | No Loss and No Harm | No Loss or Minimal Harm | Minimal Loss or Moderate Harm | | Substantial Loss or Harm | 5 | |
| Subtotal 1 | | | | | | | |
| Restitution | No | Complete | Partial | Complete | Complete | 2 | |

| | Restitution | Restitution Under Compulsion (e.g. Threat of Losing Job) | Restitution | Restitute Immed. After Loss or Violation Brought to Attention | Restitution Volutarily. Before Institution or Examiner Uncovered Loss | | |
|---|---|---|---|---|---|---|---|
| Good Faith | None | | | | Unintentional Violation | 3 | |
| Full Cooperation | None | | | | Forthcoming in Interviews | 2 | |
| Subtotal 2 | | | | | | | |
| Total (Subtract 2 From 1) | | | | | | | |

The suggested amounts for Civil Monetary Penalties are:

| Points | Amount of Penalty |
|---|---|
| 10 - 39 | $1,000 to $5,000 |
| 40 - 59 | $5,000 to $10,000 |
| 60 - 79 | $10,000 to $25,000 |
| 80 - 99 | $25,000 to $75,000 |
| 100 - 119 | $75,000 to $125,000 |
| 120 + | greater than $125,000 |

These suggested amounts are for tier 1 penalties. Facts and circumstances, as well as pertinent legal considerations, may warrant the use of tier 2 or tier 3 penalties.

The amount of pecuniary gain that the party received as a result of the violation may increase the amount of the penalty assessed beyond the range set forth herein as long as the total penalty remains within the maximum statutory amount.

The amount of the penalty may be mitigated by the financial resources of the party assessed.

Title 12 § 34.101 discusses the registration of residential loan originators.  Section 34.101 states:

(a) *Authority.* This subpart is issued pursuant to the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, title V of the Housing and Economic Recovery Act of 2008 (S.A.F.E. Act) (Pub. L. 110–289, 122 Stat. 2654, 12 U.S.C. 5101 *et seq.* ).

(b) *Purpose.* This subpart implements the S.A.F.E. Act's Federal registration requirement for mortgage loan originators. The S.A.F.E. Act provides that the objectives of this registration include aggregating and improving the flow of information to and between regulators; providing increased accountability and tracking of mortgage loan originators; enhancing consumer protections; supporting anti-fraud measures; and providing consumers with easily accessible information at no charge regarding the employment history of, and publicly adjudicated disciplinary and enforcement actions against, mortgage loan originators.

(c) *Scope.* (1) *In general.* This subpart applies to national banks, Federal branches and agencies of foreign banks, their operating subsidiaries (collectively referred to in this subpart as national banks), and their employees who act as mortgage loan originators.

(2) *De minimis exception.* (i) This subpart and the requirements of 12 U.S.C. 5103(a)(1)(A) and (2) of the S.A.F.E. Act do not apply to any employee of a national bank who has never been registered or licensed through the Registry as a mortgage loan originator if during the past 12 months the employee acted as a mortgage loan originator for 5 or fewer residential mortgage loans.

(ii) Prior to engaging in mortgage loan origination activity that exceeds the exception limit in paragraph (c)(2)(i) of this section, a national bank employee must register with the Registry pursuant to this subpart.

(iii) *Evasion.* National banks are prohibited from engaging in any act or practice to evade the limits of the *de minimis* exception set forth in paragraph (c)(2)(i) of this section.

## The Fraud Enforcement Recovery Act

117.    In 2009, Congress passed the Fraud Enforcement Recovery Act (FERA), an act to

improve the enforcement of mortgage fraud, securities fraud, commodities fraud,

financial institution fraud, and other frauds related to Federal assistance and relief

programs, for the recovery of funds lost to these frauds, and for other purposes.

118.    On May 20, 2009, FERA was signed into law.

119.    FERA changed the definition of a financial institution for the purposes of federal

criminal law to include mortgage lending businesses, which are defined as

organizations which finance or refinance any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce.

120. FERA also extends the prohibition against making false statements in a mortgage application to employees and agents of a mortgage lending business.

121. FERA adds this definition —as well as "any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974—to the definition of "financial institution" in 18 USC § 20.

122. The crime of major fraud against the United States (18 USC Sec. 1031), which previously only covered fraud in government procurement and contracts and services was amended by FERA to include a wider range of government involvement, including grants under the American Recovery and Reinvestment Act of 2009, transactions made under the Troubled Assets Relief Program, and "any other form of Federal assistance."

123. FERA also defined "proceeds" as any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

124. FERA expands the grounds for liability under the False Claims Act (FCA), 31 USC §§ 3729–3733. It does so by clarifying that the FCA covers false claims for government money or property: (1) whether or not the claim was presented to a government employee or official; (2) whether or not the government has custody of the money or property; and (3) whether or not the person or entity specifically

intended to defraud the government.

125.     FERA accomplishes the above by amending the grounds for liability and altering (and adding) key definitions to the statute. After the amendments, the FCA may be enforced against any person or entity that "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The statute's definition of "claim" makes clear that this includes false records or claims made to the government or to contractors or other recipients of federal funds. Further, the new definition of "material" includes statements or records "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

126.     FERA revises "claim" in the False Claims Act to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property." This definition of "claim" includes any request or demand presented to the United States or "made to a contractor, grantee, or other recipient" if "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States provides or reimburses any portion of the money or property.

127.     Thus, FERA expressly applies to "claims" made to Freddie Mac and Fannie Mae.

**The Federal False Claims Act**

128.     The federal False Claims Act, 31 U.S.C. §§ 3729 to 3733, provides, in pertinent part, that:

(a) Liability for certain acts.

(1) In general.  Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(C) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the United States Government for a civil penalty … plus three times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions.  For purposes of this section –

(1) the terms "knowing" and "knowingly –

(A) mean that a person, with respect to information--

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a) and (b).

129.     The False Claims Act imposes liability on any person who knowingly presents or

causes a false or fraudulent claim to be presented for payment, or to make or use a

false record or statement to get a false or fraudulent claim paid by the

government. 31 U.S.C. §3729(a)(1)(A) and (B).

130.     The False Claims Act is violated not only by a person who makes a false

statement or a false record to get the government to pay a claim, but also by one

who engages in a course of conduct that causes the government to pay a false or

fraudulent claim for money.

**The New York False Claims Act**

131.   The Plaintiff State's False Claims Act mirrors the broad proscriptions of the Federal False Claims Act, including those set forth in §§3729(a)(1)(A), (B) and (C).

132.   The Plaintiff States' False Claims Acts have liability provisions similar to those in the Federal False Claims Act.

133.   The State of New York invests heavily in Defendants through pension funds.

134.   New York State and City governmental entities with investments in the defendants include the New York City Employee's Retirement System; the Teachers' Retirement System of the City of New York; the New York City Police Pension Fund; the New York City Fire Department Pension Fund; the New York City Board of Education Retirement System; the New York City Police Officers' Variable Supplements Fund; the New York City Police Superior Officers' Variable Supplements Fund; the New York City Firefighters' Variable Supplements Fund; the New York City Fire Officers' Variable Supplements Fund; Teachers' Retirement System of the City of New York Variable Annuity Funds; the City of New York Group Trust; and the New York City Deferred Compensation Plan (collectively "the Funds").  The Funds are funds that provide pension and other benefits to hundreds of thousands of current and former employees of the City of New York.

135.   The Funds have invested heavily in Defendants.

136.    For example, as of March 31, 2010, the NYSCRF owned 36,845,430 shares in the Bank of America Corporation.  The shares originally cost $816,848,064.00, and simple calculation reveals that the NYSCRF paid $22.17 for each share.

137.    As of March 31, 2010, the shares lost value, and their value slipped to $657,690,926.00, representing a loss of $159,157,141.00 to the NYSCRF.

138.    Also as of March 31, 2010, the NYSCRF owned 4,122,641 shares in Defendant bank of New York Mellon Corporation.  The shares originally cost $83,044,794.00.

139.    As of March 31, 2010, the shares were valued at $127,307,154.00.

140.    As of March 31, 2010, the NYSCRF owned corporate bonds issued by Bank of America.  They are set to mature in May 2013.  As of March 31, 2010, their market value was $43,939,476.00.

141.    The NYSCRF also owned corporate bonds issued by Bankamerica Corporation, the predecessor to Bank of America.  The bonds were set to mature on October 11, 2011.  As of March 31, 2010, their market value was $28,058,153.00.

142.    The NYSCRF invests heavily in Defendants for the short term in addition to making the above investments.  For example, NYSCRF had invested more than $43 million in short term notes as of March 31, 2010.

143.    The NYSCRF made other sizable investments in Defendants' subsidiaries.  For example, as of March 31, 2010, the NYSCRF owned more than five million shares in the Mitsubishi UFJ Financial Group, Inc. aka Merrill Lynch PB Securities Co. Ltd., a wholly owned subsidiary of Bank of America.  The shares originally cost the State of New York $44,776,927.00.

144.    By March 31, 2011, the value of the shares had fallen to $26,282,684.00.

145.    Relator estimates that Bank of America, to cleanse its balance sheet of the overvalued loans complained of herein,  must "write down," or take a loss, conservatively estimated at approximately 6.6 billion dollars.

146.    Bank of America has taken write downs before. For example, on February 24, 2011, it was announced that Bank of America had taken a write down of $20.3 billion due to deteriorating credit and new regulations.

147.    Bank of America's write down caused the entire U.S. banking industry's 2009 net income to swing from a $12.5 billion profit to a $10.6 billion loss.

148.    The write down is believed by industry analysts to have caused the stock price to drop 4%.

149.    Overall, the value of Bank of America stock has decreased from $22.17 per share when it was purchased by the NYSCRF to $6.03 per share as of the close of business on November 10, 2011.

150.    The value of Bank of America shares will likely fall again when Bank of America reveals the true extent of its overvalued REO properties.

151.    If valued at the close of business on November 10, 2011, NYSCRF's shares in Bank of America would be worth only $222,177,942.00, a loss in value of $594,670,121.10 for the State of New York.

152.    Though it is difficult to anticipate exactly how the market will react to any specific incident, history dictates that another Bank of America write down will cause another loss to the NYSCRF of at least 4% and likely more.

153.   Had the State of New York known the true nature of Bank of America's finances, it would not have invested so heavily in Defendants' stocks and bonds.

154.   The State of New York relies heavily on Defendants to be truthful when making representations about their financial health and status.

155.   When making decisions about how to make investments for the Funds, New York State first has an outside consultant review the balance sheets and prospectuses of different entities, including Defendants.  If the balance sheets and prospectuses show that investment will result in growth, the outside consultant recommends that the NYS Controller invest money from the Funds in the entity.

156.   Relying largely on the recommendation of the outside consultant, the NYS Controller invested New York pension and retirement funds in Defendants.

157.   Similar procedures exist in the other Plaintiff States for management of the Funds.

158.   Defendants had an obligation to be truthful to the State of New York about their financial health.

159.   Defendants had an obligation to be truthful and accurate when relaying information about their financial health to all of the Plaintiff States, so that Fund managers and controllers could make well informed decisions about how to invest public dollars on behalf of public employees.

160.   In New York, the Martin Act prohibits the misrepresentation or omission of a material fact when engaged in the issuance, distribution, exchange, sale, negotiation, or purchase of securities.

161.    In addition, Sarbanes Oxley requires bank officials to certify on quarterly basis that the financial information is being reported accurately to shareholders and the governments.

162.    Defendants misrepresented the value of REO properties on their balance sheets by an estimated $6.6 billion dollars and likely more.  Specifically, they overvalued the REO properties by at least $6.6 billion and need to write down the value of these assets to show the correct value of its loan portfolio.

163.    The misrepresentation or overvaluation of $6.6 billion is material in that the State of New York, or any other investor, would have found the overvaluation amount a factor in making a decision whether or not to purchase securities issued by the Defendants.

In other words, Defendants violated the Martin Act because they misrepresented the true nature of their REO properties.

**Bank Of America Admits Liability Under Fera And The False Claims Act For Fraudulent Loan Transactions**

164.    Defendant Bank of America admits that fraudulent loan documents would result in liability under the Fraud Enforcement and Recovery Act. : (http://sharepoint.bankofamerica.com/sites/CRE_learning_wiki/Mort_Lend/All%20 Roles/F...)  This document states:

*If the bank approves a fraudulent loan transaction or modification on a government insured or backed loan program, then this is considered a false claim for using federal funds. False claims against the United States government have severe penalties:*

*\* The bank may lose the ability to offer certain government insured loan programs within loan modifications.*

*\* The bank has reputational risk if associates do not prevent fraudulent loans from funding.*

## Bank Of America Estimates The Damage It Causes Under FERA And The False Claims Act To Be The Cost Of Repurchasing The Fraudulent Loans

165.   The same document that states Bank of America's liability under FERA also identifies how the damage it causes the government can be calculated, stating *"The bank can be liable for repurchase of the loan from the government."*

166.   The appraisal issues alleged in this Third Amended Complaint and the incorporated Relator Statements demonstrate that Bank of America did and continues to cause and approve fraudulent loan transactions and modifications on government issued or government backed loans. The Table below applies estimates violation ratios to the yearly totals of impaired residential mortgage assets derived from Bank of America's annual reports and SEC filings.  For example, if a violation occurred on 25% of the analyzed categories, then $25,420,852,500 (twenty-five billion, four hundred twenty million, eight hundred fifty-two thousand, five hundred dollars) would reflect the total dollar amount, during this time period, that would be subject to risk of buyback requirements by government entities.   The Table illustrates Bank of America's "Buy Back" Liability under FERA.

Overvaluation Ratio Summary

| Year | 10% | 15% | 20% | 25% | 30% | 35% | 40% |
|---|---|---|---|---|---|---|---|
| 2007 | $277,400,000 | $416,100,000 | $554,800,000 | $693,500,000 | $832,200,000 | $970,900,000 | $1,109,600,000 |
| 2008 | $1,002,300,000 | $1,503,450,000 | $2,004,600,000 | $2,505,750,000 | $3,006,900,000 | $3,508,050,000 | $4,009,200,000 |
| 2009 | $3,050,100,000 | $4,575,150,000 | $6,100,200,000 | $7,625,250,000 | $9,150,300,000 | $10,675,350,000 | $12,200,400,000 |
| 2010 | $3,712,700,000 | $5,569,050,000 | $7,425,400,000 | $9,281,750,000 | $11,138,100,000 | $12,994,450,000 | $14,850,800,000 |
| 3Q 2011 | $2,125,841,000 | $3,188,761,500 | $4,251,682,000 | $5,314,602,500 | $6,377,523,000 | $7,440,443,500 | $8,503,364,000 |
| | 10% | 15% | 20% | 25% | 30% | 35% | 40% |
| Total | $10,168,341,000 | $15,252,511,500 | $20,336,682,000 | $25,420,852,500 | $30,505,023,000 | $35,589,193,500 | $40,673,364,000 |

## DEFENDANTS' FLAWED AND MISLEADING APPRAISAL PROCESS

### Overview

167.   Relator Madsen alleges defendants knowingly, willfully, and intentionally defraud the government plaintiffs by systemically providing non-USPAP compliant appraisals that overvalue residential properties.  Relator also alleges that Defendant Bank of America maintains a shadow inventory of "at risk" properties that it fails to properly disclose and value as a liability and a danger to the defendants' financial health.  Finally, Relator alleges Defendant Bank of America retaliated against him for reporting the contained herein allegations as violations of the false claims act and several securities laws and provisions.

168.   Numerous state and federal statutes and regulations serve to prevent fraud and abuse in the mortgage industry. Defendants violated these statutes and regulations and have thereby defrauded the government plaintiffs of billions of dollars.

169.   Relator has identified a class of real estate-related assets reported by Bank of America that are currently considered non-performing.

170.   Foreclosed real estate owned by the bank and its subsidiaries

171.   Mortgages securitized by real estate that are in default but have yet to be foreclosed.

172.   For Bank of America alone, the affected class of assets just described has been roughly calculated to be $43,976,150,250.

173.   Research conducted by the Relator has revealed a range of overvaluation for at risk properties of between 15 and 40% of market value

174.   Conservatively speaking, Relator uses the low end of the range of overvaluation, or 15%, for REO properties to determine that Defendants' practices have resulted in roughly $6.6 billion in overvaluation of collateral assets for Bank of America's non performing loan portfolio.

**Improper, Misleading, and Fraudulent Appraisals**

175.   Defendants engage in improper, misleading, and fraudulent appraisal practices to inflate their collateral assets, to reduce their Federal Reserve requirements, and to overvalue Bank of America and other Defendants' stocks.

176.   Defendants deliberately engage in non USPAP compliant appraisal practices.

177.   Defendants also violate FHA, VA, Fannie Mae, and Freddie Mac requirements to arrive at inflated appraisal values.

178.   Fundamentally, Defendants' appraisals are not completed independent of the Defendants' financial interest in the determination of the property's value. This

lack of independence causes Defendants to value properties at an amount higher than they would bring at market.

179.    Specifically, Defendants:

   a.   Prescribe and utilize improper "highest and best use" analysis with regard to the most likely buyer of distressed residential properties;

   b.   Fail to recognize the existence of both wholesale and retail markets within the same geographic areas and improperly analyze a subject property's condition impact on value in each market strata.

   c.   Improperly use AVM (Automated Valuation Model) data to determine market condition adjustments.

   d.   Improperly use "cost to cure" based adjustments rather than adjustment derived from analysis of the subject market and comparables presented in the report.

   e.   The letter of engagement and scope of work documents for each REO property assignment contain inconsistencies and incongruities that place appraisers, LandSafe, clients, and any subsequent assigned users of the report at legal risk personally, individually, and collectively.

180.    Relator discovered that the Defendants' overvaluation and appraisal violations are national in scope.

181.    In March 2010, Relator reviewed the Bank of America national policy and procedures website, and through that website, Relator discovered policy documents contradicting LandSafe's standard operating practices in place.  The existence of contrary policy documents demonstrates Defendants know and

understand what must be done to accomplish a proper valuation, but in practice, choose to adhere to a practice in place of system-wide improper valuation methods.  In fact, Defendants fight against, deter, and penalize appraisers who seek to comply with proper valuation methods.

182.   The improper valuation practices Relator personally witnessed were national and standard operating procedures.  In other words, improper valuation practices are in effect throughout all of LandSafe.

183.   In some instances, LandSafe canceled the Relator's properly completed valuation reports and contracted with non-employee fee-based appraisers to perform new valuation reports that were more favorable to the Defendants.

184.   These replacement appraisals were subsequently made available to all staff appraisers through the Defendants' Appraisal Vault website.

185.   Relator obtained copies of replacement appraisals from the Defendants' Appraisal Vault website and found numerous USPAP violations evidenced therein.

**Examples of Improper Appraisal Practices and Reports**

**Allerton Court**

186.   In November 2010, Relator completed a report on 109 Allerton Court, Folsom CA.  Relator appraised 109 Allerton Court at $569,000.

187.   Relator's Opinion of Value for 109 Allerton Court was significantly less than the contract value of $749,000.

188.   LandSafe Staff Reviewer Frank Reynolds and Regional Chief Appraiser R. Lee Bess failed Relator's report only because it valued the property at significantly less than the contract price of $749,000.

189.    In an email, LandSafe Staff Reviewer Frank Reynolds stated, "Now, perhaps the
        sale price may be too high, but [Relator] is not giving credence to the possible
        quality differences and why it sold for so much more than his value of $569K.
        Did he talk to the Realtor? NO.  I just think that perhaps someone else needs to
        look at this before seller/buyer gets an appraisal back for $200K less, or
        approximately 25% less than contract  price."

190.    In other words, the sole reason LandSafe Reviewer Reynolds failed the Relator's
        report was that the Opinion of Value did not sufficiently approximate the
        purchase price of the property.  Reynolds ignored the fact that the Relator's
        Opinion of Value had been derived through credible and USPAP-compliant
        methodologies.

191.    A second Senior LandSafe Staff appraiser, Darla Queresma, valued the property
        at $600,000 using unacceptable appraisal practices including, the use of
        comparables outside of the subject neighborhood, the use of non-bracketing
        comparables, and across the board adjustments on several key variances.

192.    LandSafe accepted Queresma's higher value appraisal and issued a Certificate of
        Value to the client based on the Queresma's "replacement" appraisal thereby
        corroborating the value opinion indicated by Queresma.

193.    Relator subsequently reviewed the Queresma appraisal and notified management
        that the first appraisal for $569,000 should not have been failed as it was
        performed within bank guidelines, and the two appraisal values were within 5%
        of each other.

194.   Five percent variances of value are considered reasonable, acceptable, and credible within the appraisal industry.

195.   Relator was told by management that Relator's report failed because the report should have explained in more detail why his lower Opinion of Value differed so greatly from the contract price of $749,000, and that this lack of explanation of the difference in value was the sole reason why the appraisal report of $569,000 was failed.

196.   The reason given for the failure of the Relator's report was pretext. The report was failed by LandSafe because it differed significantly from the contract price of $749,000, not because of any deficiency in the reporting process or content. The close but higher Queresma Opinion of Value validated Relator's Opinion of Value for the Allerton Court property and was found to have no mention, analysis, or reconciliation of the subject's contract price compared to the opinion of value. In other words, it had the exact same alleged "deficiency" for which Relator's appraisal was failed.

197.   There were several improper, unacceptable, appraisal practices used by Queresma to increase the appraised value of Allerton Court property to $600,000. Specifically, Relator found Queresma used improper comparables taken from a golf course development in the neighboring town of El Dorado Hills, an area with traditionally higher property values rather than using directly competing sales and listings from the subject's own neighborhood that indicated a lower value range. As previously stated, the Queresma appraisal did not explain or even address the difference between the Opinion of Value and the contract price, much less explain

it in greater detail than did Relator's appraisal.  Reynolds' explanation for failing

Relator's lower valued appraisal was pretext.

198.   Over the years he has worked for LandSafe, Relator determined that the average

time listing stays on the market is three to six months if properly priced.  Allerton

Court is still on the market as of the writing of this amended Third Amended

Complaint and is considered overvalued.

199.   Defendants' determination that Relator's report on 109 Allerton Court failed

LandSafe Review Standards reduced Relator's quality rating with the company

and resulted in a loss of income and availability of work for the Relator.

200.   Specifically, the reduction in Relator's quality rating caused him to fall below a

report quality threshold required to obtain regular volumes of work.  Had

Relator's appraisal of Allerton Court been passed, he would have been eligible to

earn significantly more income through a normal volume of appraisal

opportunities.

201.   The next several paragraphs provide examples of specific instruction by

management that resulted in flawed appraisals.

**Antelope Road**

202.   Relator completed another appraisal of a distressed REO property on 7424

Antelope Road in Citrus Heights in CA.  Relator noted that the property needed at

least $5,000 in repairs and had significant deficiencies that would preclude it from

conventional mortgage financing.  Per LandSafe's direction, Relator checked the

URAR box indicating the value was "as is" when the actual value on the URAR

was subject to hypothetical conditions and extraordinary assumptions,  a direct violation of USPAP Ethics provisions and Standards 2-1 and 2-2.

203.    Additionally, LandSafe requires that the values on the URAR and the REOAD forms match, thereby providing a misleading value on both forms.  As stated on page 6 of 18 of the letter of engagement:   The "As Is" value in the Sales Comparison Approach must match the "As Is" value based on a reasonable market exposure time in the Supplemental REO addendum, the first field in the list of values.

204.    Therefore in an attempt to comply with client requirements a contradiction has been created between the 1004 form, the REOAD form, and the opinion of value provided.  As such the report is not considered to comply with secondary market guidelines.  Without understanding the nature and implications of the contradiction outlined here, such a report could be considered misleading.

205.    "REOAD" is a nickname for the Real Estate Owned Addendum form. This form is used on valuation assignments to provide the reader with additional analysis of the subject property. The form reports costs for required repairs noted in the subject and then uses that information to derive the property's value.

206.    The Antelope Road appraisal provides an example of how the contradictions between the 1004 form, the REOAD form, and the opinion of value affect the valuation process.

207.    For an example of how the Antelope Road property needed significant repairs. Among other things, a backyard swimming pool was lifting out of the ground and

was therefore no longer structurally sound or even repairable, creating a
significant trip and fall risk.

208.    Internal logic errors and misleading values presented in the report that were the
direct result of the aforementioned conflict were not addressed.

209.    For Antelope Road, LandSafe Staff Reviewer Reynolds determined that the
$5000 of repairs should be calculated as a dollar for dollar "cost to cure" the
problem and directed Relator to write the report accordingly.

210.    Only using "Cost to cure" is an invalid method for assessing market reaction to a
distressed property because the repair estimates alone should not be used to
predetermine a market's reaction to a property's deficiencies.  Such reaction
should only be derived from analysis of the market itself and the actions of buyers
within that market.   In addition, because many of the repairs presented by
distressed REO properties are unusual, they should only be valued through an
analysis of actual market reaction to the particular defect or a similar defect.

211.    LandSafe's mechanical and simplistic cost to cure adjustment practice is an
invalid method of measuring market reaction without a verifying market analysis
to confirm that the market is reacting to variances in the same amount as the cost
to cure.   For example: if a stove is missing from a property the likely market
reaction would be to require the stove be replaced before close of escrow.   In
other words, market reaction would equal cost to cure.  If there were significant
structural problems with a residence, the market reaction would likely be highly
different from the cost to cure as a result of the scope of required repairs and the
uncertainty involved with larger repairs like this.   Defendants direct appraisers to

factor "cost to cure" estimates on a dollar by dollar basis.  This method of valuation is not credible.  It is misleading and does not result in an accurate valuation of the property.

212.  LandSafe does not encourage appraisers to perform the necessary market analysis, which is required for reliable valuation.  The recommended "practice in place" is to use the estimated cost to cure the deficiency as an adjustment in the sales comparison grid of the URAR form.

213.  The recommendation was made by management as part of a mandatory staff call and documented in an agenda document for that staff call.

214.  When relator forwarded this instruction to the Appraisal Foundation, the Foundation informed relator that management had recommended an unacceptable appraisal practice.

215.  As a result,  LandSafe minimizes or fails to identify and properly analyze additional costs associated with major repairs or renovations, such as the fact that these properties do not qualify for conventional financing frequently requires cash expenditure to purchase the residence, added to the need to front costs for materials and/or labor, the need for high level expertise in resolving a particular problem, the costs associated with delays in moving into the residence, etc., preclude the consideration of these types of distressed properties from potential purchase by the average homeowner.  The typical retail customer has no idea what additional costs are associated with these major repairs and has no ability to repair the problems him- or herself.

216.     USPAP instructs "cost to cure" adjustments without validating market analyses is considered an unsound appraisal practice.   Use of cost to cure adjustments without market analysis violates USPAP, Certification 9 on the URAR, as well as FHA, VA, Fannie Mae, and Freddie Mac requirements.

217.     In short, the retail market is not the likely buyer for a property that requires significant repairs and does not qualify for conventional financing.  The primary market that will be interested in distressed REO properties with significant repairs to be made will be investors and contractors, otherwise known as the "wholesale" market.

218.     LandSafe mandates appraisers to predetermine the "highest and best use" market for REO properties to be the retail market, or the ordinary homeowner who wants to qualify for conventional financing.  When LandSafe appraises a property that is not considered viable for the retail market, LandSafe intentionally obscures this fact on the appraisal so that the report makes it appear the property would appeal to a conventional home owner.

219.     Most prominently, the URAR, Freddie Mac Form 70/Fannie Mae 1004 should not be used when a property does not qualify for conventional financing.  The very presence of the URAR/Form 70/Form 1004 gives the impression that the subject property could qualify for conventional financing.

220.     Despite numerous assertions by Relator that certain distressed REO properties, identified by specific qualifications and observations, were not viable for sale on the retail market, Defendants have steadfastly refused to appraise the subject properties accordingly and in conformity with USPAP requirements.

221.     For example, Relator's manager Scott Sutton instructed Relator, "Bank of America does not make loans to real estate investors.  As such, they cannot be considered the most likely buyer for an REO property."

222.     Relator reported concerns about Reynolds's appraisal review practices to management who endorsed Reynolds's improper review techniques.

**Rockport Circle**

223.     Relator completed an appraisal of a residential property at 478 Rockport Circle, in Folsom CA.  On November 30, 2010, Reynolds documented that he agreed with Relator's appraisal of the value of the property and recommended no further action, yet failed the Relator's appraisal.

224.     Relator's quality rating for the report was reduced to "2."

225.     Relator complained to management that the failure of the report was due to the reviewer's error.  Management failed to take any corrective action, and therefore the failure of the report resulted in Relator being unable to receive appraisal work through normal assignment mechanisms and substantially reduced his income.

226.     If the Rockport Circle appraisal had received a quality rating of "3" or higher, the Relator would not have fallen below LandSafe's "quality" threshold.  He subsequently lost thousands of dollars of appraisal work.

227.     In response to several "failed" reviews of appraisals completed by Madsen, Relator requested a meeting with Regional Chief Appraiser Lee Bess and District Manager Scott Sutton of LandSafe, which was held on February 8, 2011 at the Bank of America Corporate offices in Rancho Cordova, CA.  Relator had requested the meeting to discuss the failed appraisals of November and December

2010 and to report systemic appraisal violations being perpetrated by the Defendants.

228.  Relator arrived at the meeting with copies of the failed November and December 2010 appraisal reports and opinions of appraisal industry experts regarding LandSafe's appraisal practices and significant documentary evidence to support Relator's analysis and results and to discuss with management the problems with adherence to USPAP, Fannie Mae, and Freddie Mac standards created by Defendants' practice in place policies.

229.  Relator objected to Defendants' appraisal practices because the Defendants:

230.  Prescribe and utilize improper "highest and best use" analysis with regard to the most likely buyer of distressed properties on the market;

231.  Fail to recognize the existence of both wholesale and retail markets within the same geographic areas and improperly analyze the parties' impact in each market strata on value.

232.  Instruct appraisers to solely use provided AVM data to determine market condition adjustments.

233.  AVM analyses are largely irrelevant for the stated intended use of these appraisal reports because they utilize all sales data in a given time frame within an entire zip code. This includes all residential types, sizes, etc. that have vastly different market dynamics and price elasticities (reactions to changes in supply and demand) rather than focusing on the types of properties being analyzed in the appraisal report. (In other words AVM analyses are commonly not an apples to apples, oranges to oranges type of comparisons)

234.    LandSafe Review Appraisers are charged with the use of Analytic website based

AVM's such as Valuefinder.com, a bank owned AVM system.  The use of such

AVM analysis is considered inaccurate as it is not based on comparables chosen

for their relevance and similarity to the subject property.  Analytics websites such

as Zillow.com, Valuefinder.com and others provide such an analyses, however the

variance is averaged over all sales, in all prices ranges, in all neighborhoods

within a given zip code.  It is a well known fact that different neighborhoods,

demographics and residential types (in terms size, quality and amenity) all exhibit

different price elasticity (reactions to changes in supply and demand).  Industry

opinion is that use of such figures provided by analytics websites such as those

mentioned is the result of inadequate analysis of the market and/or the provenance

of the data presented by the website.

235.    A more accurate method of analyzing market dynamics is to analyze the

comparables presented in the appraisal report (as the most relevant comparables)

and other comparables identified as being direct competitors in the subject's

market both historically and contemporaneously.

236.    Improperly use "cost to cure" based adjustments rather than adjustment derived

from analysis of relevant comparables

237.    Letters of engagement and scope of work documents for each REO property

assignment contain inconsistencies and incongruities that place appraiser at odds

with legal obligations.

238.    Bess and Sutton refused to review the expert opinions and other documentation

provided by Relator.

239.  Bess and Sutton instead admonished Relator for taking up their valuable time and demanded Relator respond to miscellaneous complaints about Relator's performance.  One such complaint had erroneously attributed another appraiser's conduct to Relator.

240.  When Relator reported that appraisals of certain distressed REO properties should use the assumption that the most likely purchaser was an investor or a contractor, based on specific criteria derived from a highest and best use analysis, Sutton replied, "Bank of America is not in the business of making loans to investors/contractors.  As such, they cannot be considered the most likely buyer."

241.  Bank of America has rigidly maintained that it does not make loans to investors/contractors, only to the retail market.

242.  Bess and Sutton discounted Relator's concerns about non compliant USPAP practices by saying, "If these issues are wrong and LandSafe is doing these things wrong, how come nobody else is complaining?"

243.  During the five hour meeting, Sutton told Relator that Relator was taking up an inordinate amount of Sutton's time. Sutton and Bess made it clear to Relator that they found Relator's concerns to be a nuisance, and Relator needed to simply adhere to LandSafe appraisal practices, without regard for USPAP compliance.

244.  There was and has been no indication that erroneously attributed complaints about Relator, and erroneously completed reviews of Relator's work have been corrected or removed from Relator's personnel file, though supervisory personnel became aware on February 8, 2011, that those complaints were the result of the conduct of other appraisers and had been improperly attributed to the Relator and

that several reviews performed on Relator work were failed for erroneous reasons and/or pretext.  No compensation for lost wages or income has been offered.

245.   Because he feared his supervisors would terminate his employment, Relator complied with Sutton's and Bess's directions and changed his appraisal practices. To conform to LandSafe's express directions, Relator produced 10 to 20 non-USPAP compliant appraisals over the next two months.

246.   All appraisals for LandSafe and Bank of America undergo a review for the stated purpose of ensuring that the appraisals comply with USPAP, FHA, VA, Fannie Mae, and Freddie Mac requirements.  Appraisal reviewers are based all over the United States, and Relator's appraisals were distributed to different LandSafe reviewers in different states.

247.   None of the Relator's non-compliant appraisals were rejected by LandSafe reviewers, either locally or from other states.

248.   The universal failure of LandSafe to reject these non-USPAP compliant appraisals indicates that the Defendants' appraisals nationwide are at high risk for non-USPAP compliance.

**Sandwick Way**

249.   One example of a non-USPAP compliant report that Relator completed per management's direction involved a residential property at 1052 Sandwick Way in Sacramento CA.

250.   Relator had performed multiple inspections over two years with the most recent on February 4, 2011.  He issued a Freddie Mac Form 70/Fannie Mae 1004 of his

findings on February 9, 2011, the day after his five hour meeting with LandSafe management personnel.

251.    At the most recent inspection, water had damaged the flooring in the property at 1052 Sandwick Way.

252.    The floor had been damaged by an unknown water source permeating the subject property's concrete slab foundation.  It was not clear where water had come from or how the problem could be fixed.  The source of the water or remediation of the problem could not be determined without invasive investigation.  To address the problem, one would have to open the slab and inspect the exposed plumbing first. After repairs were accomplished the slab would then have to be re-poured.  If there was leaking plumbing in the slab, or if the slab was defective, or if the water barrier material below the slab was defective, it is conceivable that complete demolition and rebuilding of the dwelling would be the only way to effectively remediate the water problem.

253.    Relator had been informed by homeowner that multiple houses in the development suffered similar water damage, and other homeowners had filed a class action lawsuit against the builder.

254.    Per management's direction, Relator listed a $6000 cost to cure figure for replacement of damaged floors and was subsequently instructed to use the $6 thousand figure as a condition adjustment in the sales comparison approach to value.

255.    Relator was also instructed to "call for an inspection" on the REOAD, in accord with LandSafe policy. Calling for inspection on the REOAD hides the use of an

extraordinary assumption regarding the deficiency and its effect on market value by reporting the deficiency in an obfuscated manner.

256. As explained earlier, "REOAD" is an acronym for Supplemental Real Estate Owned Appraisal Addendum. Information on the REOAD is attached to Freddie Mac Form 70/Fannie Mae 1004, and it often follows several pages of Addendum, photos, plot plans, etc. The information on the REOAD's form can be considered misleading if not properly reconciled to the Fannie Mae Form 1004 information. For example, if a hypothetical condition is logically applied the values of the 1004, then it follows those same conditions are being applied to the values on the REOAD. LandSafe policy requires these two values be identical. If hypothetical conditions or extraordinary assumptions have been utilized in determining the value reported on the 1004 form and the same value is required to be reported on the REOAD form, then it follows the same hypothetical conditions or extraordinary assumptions have been applied to both reported values. The REOAD has no specific provision for disclosing the use of hypothetical conditions or extraordinary assumptions in the generation of the reported value on the form and is therefore considered misleading when such conditions and assumptions have been employed and not disclosed.

257. The REOAD form does not preclude additional communication of the necessary analysis and explanation of the rationale used in concluding results. However, LandSafe's practice-in-place indicates that additional explanation is not allowed or encouraged.

258.    In this circumstance, logic dictates the appraised value of the property should have been obviously and clearly conditioned on the hypothesis that the source of the water had been found and that work to repair the floor and prevent future problems had already taken place. Such a hypothesis needs to be marked clearly on the Freddie Mac Form 70/Fannie Mae 1004 URAR and the impact that hypothesis had on the opinion of value clearly stated.

259.    USPAP requirements and Certification 9 of the URAR require the property to be appraised using market reaction analysis to a particular subject property's condition or deficiency.  This analysis is obtained by comparing by the subject property with another property with a similar condition or deficiency.

260.    USPAP, nor Fannie Mae, nor Freddie Mac, nor the FHA, nor the VA allow an estimated cost for repair  to be simply deducted from a property's value in the way LandSafe dictates with its cost to cure practice.

261.    For example, on the Sandwick Way property, the use of a cost to cure adjustment (based on cost of replacement of the flooring material only) fails to take into account the repair costs of preventing the water from intruding in the first place. Such intrusion could have vastly different sources, and its remediation could vary greatly in price and difficulty.  The analysis of "just replace the flooring" fails to address the root cause of the damage and fails to properly address market response to the deficiency.

262.    Because the cost to cure dollar figures only provide estimates of "surface" repairs, rather than curing the problem that resulted in the damage, Defendants' use of cost to cure estimates fail to result in a properly appraised property.

263.   LandSafe's appraisal overvalued the Sandwick Way property by $25,000 to $30,000 because LandSafe management directed the Relator to use improper and non-compliant appraisal techniques.

264.   In June of 2011 Relator was asked to reappraise the property and when Relator requested contractor's bids to determine the cause of damage and projected costs to repairs, the appraisal was cancelled. At this time, the subject is still an active listing with over 491 days on market and is considered significantly overvalued because of the lack of required repairs.

**Bonny Knoll Road**

265.   On March 1, 2011, Relator inspected a residential property at 107 Bonny Knoll Road in Roseville CA.

266.   Relator filed his appraisal using a Freddie Mac Form 70/Fannie Mae 1004 Uniform Residential Appraisal Report dated March 2, 2011.

267.   The garage of the property was not made available for inspection to the Relator, but from the outside, the garage showed evidence of bowing at the roof ridgeline.

268.   Relator asked LandSafe management for direction on how to deal with the bowing of the roof for the garage.  Management directed Relator to complete the URAR "as is" and to hide the extraordinary assumption that the garage was in serviceable condition by calling for a later inspection via REOAD.

269.   As a result, the property at Bonny Knoll Road was appraised and over-valued by several thousand dollars.

270.   The subject property is still an active listing after 772 days on the market and is considered significantly overpriced and overexposed.

**Bayline Circle**

271.   On February 23, 2011, Relator appraised a residential property at 26 Bayline
       Circle in Folsom CA.

272.   The Bayline Circle property evidenced significant water damage in the living
       room, the family room, the dining room, the master bedroom, and a downstairs
       bedroom.

273.   Relator contacted LandSafe management for direction on how to appraise the
       water damage.  The Scope of Work document for the assignment directs the
       appraiser to note water damage or dampness by marking an appropriate box on
       the first page of the URAR, providing a comment, and making the report subject
       to repair or subject to inspection.

274.   LandSafe management did not permit Relator to clearly condition the appraised
       value on an extraordinary assumption.  Instead, management directed Relator to
       mark the report "as-is" and hide the extraordinary assumption in a textual
       addendum.

275.   The needed repairs and the uncertainty of the cause of the damage rendered the
       property inconsistent with LandSafe's appraisal assumption that the most likely
       purchaser would be someone who wanted to reside in the property.  Despite
       LandSafe's steadfast refusal to allow appraisers to value properties for the
       wholesale market, Bayline Circle in no way would appeal to a typical retail
       purchaser, and LandSafe's policy resulted in an appraisal that misled the reader
       into thinking Bayline Circle could qualify for conventional financing.

276. Bayline Circle's most likely purchaser would be an investor or contractor, but LandSafe did not allow appraisers to value such properties based on clear market evidence that investors or contractors would be the purchaser.

277. An investor or contractor would demand a deep discount on the Bayline Circle property because of the uncertainty and likely complex nature of the repairs needed.

278. Because management would not permit Relator to properly value Bayline Circle, the Freddie Mac Form 70/Fannie Mae 1004 URAR listed the property by $70,000 to $80,000 more than it would yield on the market in its true present condition.

279. In June of 2011, Relator  was asked to reappraise the property and when Relator requested contractor's bids to determine the cause of damage and projected costs to repairs, the appraisal was cancelled.  At this time, the subject is still an active listing with over 219 days on market and is considered significantly overvalued as a result of required repairs.

**Upham Court**

280. On February 4, 2011, Relator inspected a residential property at 2404 Upham Court in Carmichael CA.

281. The property showed signs of water damage at a structural beam in a garage that had been converted into a family room.

282. Again, management did not permit Relator to properly identify the value of 2404 Upham Court.  Relator was not permitted to mark the Freddie Mac Form 70/Fannie Mae 1004 URAR "subject to repair" or "subject to inspection."

283.    Instead, management directed Relator to assume the most likely purchaser of the property was someone who wanted to reside on the property, to mark the URAR "as-is," and to hide the extraordinary assumption through calling for an inspection on the REOAD form and in the narrative agenda.

284.    This resulted in the significant overvaluation of the subject property that resulted in it remaining unsold on the market for an additional six months and eventually going to auction per the most recent MLS listing.  Had the condition of the property been correctly reported and analyzed the subject would likely have been sold months ago to a contractor investor, who could have rehabilitated the property and resold it by now.

**Honey Rose Place**

285.    On February 21, 2011, Relator inspected a residential property at 4204 Honey Rose Place in Antelope CA.

286.    The Honey Rose Place property showed signs of water damage in the family room, the downstairs bathroom, and the master bedroom, this last through a leaking window.

287.    In addition, the property showed excessive wear and tear, rendering it generally inferior to the majority of market participants at the time of the inspection.

288.    Relator again sought direction from LandSafe management on how the appraisal should be calculated and reported on the Freddie Mac Form 70/Fannie Mae 1004 URAR.

289.    Again, management directed Relator to complete the report "as is" and to obscure the extraordinary assumption that the water damage visually noted and that the

condition could be adequately resolved through a repair costing approximately $17,000 by noting the condition on the REOAD.

290.    In addition, to deal with the inferior condition of the property created by excessive wear and tear, management directed Relator to adopt a cost to cure condition adjustment based on figures obtained from the REOAD plus a 15% entrepreneurial incentive.

291.    For Honey Rose, management was inconsistent in its prior blanket denial that the most likely purchaser of any of its properties would be a person who wanted to reside on the property. Furthermore, Defendants instructions to add a 15% entrepreneurial incentive to the cost to cure figures was incorrectly conceived and applied for the following reasons:

> 1)   contractor's entrepreneurial incentive is already part of any repair bids provided and not treated as a separate cost item, and

> 2)   the entrepreneurial incentive for investor/contractor transactions is based on the Real Estate Development Process inherent in the total enterprise and is factored on the entire sale price of the residence after renovation and resale, not just the cost of repairs.  For the Honey Rose property, management directed relator to continue to work from the assumption that the most likely purchaser was a retail customer, but directed that an investor/contractor incentive of 15% be incorporated into the appraisal figures an instruction that is wrong both in concept and application.

292.    This incentive had no basis in fact or market analysis. In other words, a ten
        thousand dollar repair does not equal a required ten thousand dollar discount to an
        investor, but in the subject market, equates more to a 20% reduction of the entire
        price of the property.  Investors are looking for a substantial return on investment
        due to significant risks and variable costs involved in the enterprise.

293.    Because of the water damage and the excessive wear and tear on the property, an
        investor or a contractor would demand a discount of 20 to 25% of the market
        value.  Because management demanded that appraisers ignore the existence of the
        wholesale market, appraisers have consistently overvalued properties because
        they have not been permitted to factor in what an investor/contractor would pay
        for a property.

294.    For the Honey Rose property, management's appraisal practices resulted in the
        property being overly valued by $20,000 to $40,000.

295.    In addition, because the extraordinary assumption regarding the repair of the
        water damage was obscured, Freddie Mac and/or Fannie Mae viewed the property
        as qualifying for conventional mortgage financing at the improperly inflated
        value.

**Elgin Hills**

296.    On February 4, 2011, LandSafe assigned Relator to appraise a residential REO
        property at 5240 Elgin Hills in Antelope CA.

297.    Elgin Hills had been occupied by renters who were evicted after they abused the
        property.  After their eviction, squatters and transients occupied the residence.

298.   The property was not habitable, could not qualify for conventional financing, and had damage that the average person could not fix.  In addition to requiring professional renovation, the property likely required hazardous material experts to remove debris from inside the residence.

299.   Extraordinary repairs were required to address extensive structural damage via water and the replacement of nearly all interior surfaces and materials.  Several areas exhibited evidence of mold.  The kitchen, dining room, and both bathrooms showed extreme water damage, and raw sewage spilled into the family room. Again, Relator followed R. Scott Sutton's directives when preparing the appraisal. Relator documented the appraisal on a Freddie Mac Form 70/Fannie Mae 1004/URAR, and by following the directives and LandSafe's practice-in-place, the completed appraisal implied that the property could qualify for conventional financing when it clearly could not

300.   Also, R. Scott Sutton directed Relator to provide a cost to cure estimate to repair the damage based on a cost figure provided through an inadequate provided contractor estimate plus an entrepreneurial incentive of 15% of cost to cure. Relator was instructed to use this figure to adjust for subject's condition in the market.

301.   Again, management's directive to include a 15% entrepreneurial incentive is logically inconsistent and wrongly applied for the reasons stated in paragraph (219).

302.   Even if the appraisal assumed that the most likely purchaser would be an investor or a contractor, a 15% entrepreneurial incentive of cost to repair does not

represent a sufficient discount margin for an investor to provide risk capital when taking into account hard and soft costs related to these kinds of real estate development transactions.

303.   Because of management's directives to appraisers on how to calculate value of Elgin Hills, the property was overvalued by as much as $40,000. The subject property is still on the market after over 940 days of exposure The average marketing time for a reasonably priced property is less than 90 days;  the subject property has been on the market over 10 times that long.

304.   Elgin Hills is considered significantly overvalued as a result of its condition.  It should be noted that this property has been vacant for over three years and is still in the homeowner's name.  Title has not been transferred to lienholder.  This property will likely end up at auction prior to the federal 60 month holding limitation

**Cobblestone Drive**

305.   On February 24, 2011, LandSafe assigned Relator to appraise a residential property at 5701 Cobblestone Drive in Rocklin CA.

306.   Cobblestone Drive had extensive damage due to deferred maintenance and a failed roof.  The roof and carpeting needed to be replaced, and several other items had to be repaired.  One estimate placed the cost of repair at $23,350.00

307.   Relator again sought management's direction on how to fill out the URAR. Management directed Relator to complete the report "as is" and to obscure the extraordinary assumptions about the feasibility of the estimated repair on the REOAD and in the narrative addenda.

308.  If properly valued, the property would not have been identified as qualifying for conventional financing because its condition and need for extensive repair would require the attention of someone with skills beyond those of a typical homeowner. The most likely purchaser of the property would not be a retail purchaser but would be an investor /contractor who would demand a significant discount in the price to consider the venture profitable from a business perspective.

309.  Because of LandSafe's flawed and improper appraisal methods, the Cobblestone Drive property was overvalued by $40,000 to $50,000.

**Rutland Drive**

310.  On March 1, 2011, Relator physically inspected a residential property at 6106 Rutland Drive in Carmichael CA.

311.  The construction of the property was incomplete due to recent extensive remodeling that had never been completed, and there was damage due to deferred maintenance and vandalism.  In addition, the garage showed evidence of rodent infestation.  The Relator also identified a concern that there was no positive grading on the lot away from the foundation.  Such conditions can lead to ponding at or near the foundation and result in settling, and foundation failures.

312.  One estimate of the cost to repair the property totaled $16,000.00.

313.  Improper identification of the most likely buyer for the subject property resulted in the estimated overvaluation of this property by as much as $40,000.

314.  This overvaluation resulted in the property being on the market for approximately another 6 months. Only after a recent price reduction at the end of June did sufficient

discounting occur for an offer to be tendered. Subject is currently pending and is believed to be in contract for an all cash transaction to an investor.

**333 Modessa**

315.   Relator's appraisal assignment located at 333 Modessa, Roseville, CA was cancelled by LandSafe in a retaliatory action in March 2011. Relator never inspected the property and as such has no direct indication of its condition. A replacement appraisal was ordered by LandSafe.  The property is still on the market over six months later and is thus assumed  to be overpriced.

316.   The average marketing time for this neighborhood for a reasonably priced property is considered to be less than 90 days.

**Sycamore Drive**

317.   On March 15, 2011, LandSafe assigned Relator to perform an appraisal of a property located at 7785 Sycamore Drive.

318.   Relator found that Sycamore Drive had significant damage due to deferred maintenance. He identified several repairs needed to bring the home into the condition required by conventional mortgage financing standards.  Those tasks are listed below:

- Remove rotted deck, and install steps to code from slider to grade.

- Replace two bedroom doors.

- Replace four closet doors.

- Minor repair of tile at kitchen counters.

- Remove wall for illegal bedroom at family room area.

- Replace bath flooring.

- Repair wood rot in bathroom.

- Replace all flooring.

- Repaint interior.

- Repair ceiling damage.

319. In addition, Relator noted the following inspections were needed:

- Roof inspection with 2 year certification by licensed roofing contractor;

- Inspect extensive wood rot at bathroom floor for cause and remediation and structural integrity of flooring joists, etc., at this location and in the surrounding areas.

- Inspect affected areas for black growths, and recommend abatement if required. Inspection of septic tank.  Note: unused underground septic tank reported to be in front yard that may or may not have been properly "abandoned'. Recommend tank be opened and inspected by qualified personnel.

320. The results of these inspections would have a significant impact on market acceptance of this property.

321. The scope of work document for Sycamore Drive dictates:

> "If there is evidence of structural settlement, such as hairline cracks, "mark the appropriate box" and provide a comment in the Improvement Section regarding whether or not this appears to be typical settlement due to the age and location of the property, If there are signs of water damage or excessive dampness or structural integrity concerns, "mark the appropriate box", provide a comment describing the issue, and make the report "subject to repair" or "subject to inspection" in the Reconciliation Section."

322.   Relator informed management of the requirements listed in the Scope of Work and that the report would have to be completed subject to both hypothetical conditions and extraordinary assumptions and showed them the scope of work document, etc.

323.   Management responded via email.  Relator received direction from Regional Chief Appraiser Lee Bess are as follows:

*Bob;*

*You wanted me to provide you guidance regarding any conflict with your "As Is" opinion of value on page 2 of the 1004 URAR form and your "As Is" opinion of value in the REO Addendum. After discussing this with Scott and Duane, we came to the conclusion that you can make your appraisal "Subject To" inspections and your opinion of value could be "As Is" (As It Currently Sits) in your reconciliation of value both in the URAR and RE Addendum. Of course you would have to discuss your methodology in detail to let the reader know that the value opinion is for the subject in its current condition with no repairs. Therefore there would not be a conflict with SR1 or of the two areas where the "As Is" values are found. Ie: 1004 URAR and REO Addendum. Your repair costs will be noted in the REO Addendum and the "As Repaired" value as you have noted in the past must/will be market derived.*

324.   Relator refused to comply.

325.   LandSafe cancelled the assignment to value Sycamore Drive and excluded Relator from doing any REO orders.

326.   Later that same day, Relator received the following email from the Texas based LandSafe Appraisal Coordinator assigned to Sycamore Drive:

*Hello Bob,*

*Considering the damages and repairs needed for this property, an "as is" value cannot be ascertained. It is acceptable to complete the report with a "subject to" value. There is no need to submit the REO addendum on this report. If you have any questions, please call me at 800-447-1512 ext 2024.*

*Thank You,*

*Ryan Wiggins*

*Settlement Services Specialist III*
*Short Sale*
*LandSafe Appraisal*

327. Via reply email, the Relator asked Ryan Wiggens of LandSafe if this was a standard

way LandSafe conducted appraisals.

328. LandSafe's Ryan Wiggins emailed his response to the question as follows:

> *This is not the standard. This is a special circumstance where we cannot provide an "as is" value and the lender authorizes a "subject to" value.*

329. Relator replied via email as follows:

*Exactly but is this the prescribed procedure for dealing with special circumstances where we cannot provide an "as is" value. Please advise.*

330. LandSafe's Ryan Wiggins responded via email as follows:

*The official procedure for dealing with properties where an "as is" value cannot be determined is for the appraiser to call Landsafe immediately and inform us that an "as is" value is not possible. The appraiser should not proceed with the appraisal before notifying Landsafe. At that point, we inform the lender of the situation and they advise how they would like to proceed.*

331. Relator next received the following email from LandSafe:

> *Per the directive from Duane Peterson, we have cancelled the appraisal order for this property. We have submitted the full fee of $470 for work completed.*

332. Later that day, LandSafe cancelled 20 orders out of Relator's work queue. Of the

twenty orders summarily cancelled from Relator's work queue, three had conditions

that would have triggered the same clause in the Scope of Work document.

Approximately another ten to twelve properties had not yet been inspected.

333. Rather than verify the correct method to complete the orders subject to this particular

Scope of Work clause, LandSafe chose to reassign the orders to another appraiser.

334.     Relator obtained copies of the three appraisals subsequently completed. All of them

         fail to correctly address and analyze the deficiencies in the properties and the

         market's reactions to those deficiencies.

335.     The reassigned report completed for 7785 Sycamore Drive:

   •     Fails to address code compliance for removed deck.

   •     Fails to address the illegal conversion of family room to sleeping quarters.

   •     Erroneously identifies the room as a den when it is used as a master
         bedroom.  This misidentification is a violation of LandSafe Policy and
         Procedures regarding illegal improvements dated 10/23/2009.

   •     Fails to identify the extent of work required for repair of the bathroom.

   •     Fails to address suspected mold issues in rear bedroom.

   •     Fails to note missing closet doors.

   •     Fails to address the abandoned septic system in front yard.

   •     Fails to list required carpet and paint repairs needed to bring the subject to
         marketable condition.

   •     Incorrectly identifies the most likely purchaser.

   •     Has no significant highest and best use analysis in light of subject condition.

   •     Underestimates the cost to repair.

   •     Uses the cost to cure provided on the REOAD addenda to address market
         reaction to condition instead of using the market itself.

   •     Buries a theoretical extraordinary assumption condition in the recommended
         inspections addenda of the REOAD.

   •     Fails to properly analyze comparables.

- Overvalues the subject property by at least $20,000 (or 20%).

**Demurrage Way**

336. On 05/10/2010 Relator inspected 100 Demurrage Way, Folsom, CA and found extensive mold and water damage at dining room.  LandSafe would not allow him to complete the report "subject to" and therefore cancelled it.  The subject would not be eligible for conventional financing and is still on the market 210 days later and is assumed overvalued.

337. On October 5, 2011, Lee Coleman, LandSafe's Chief Reviewer for Northern California phoned the Relator to discuss Coleman's rejection of Relator's valuation of a property at $200,000.

338. Coleman wanted Relator to increase the valuation by 10%.

339. The market dictated that property value was decreasing rather than increasing, and Relator did not agree with Coleman that the valuation should be increased.

340. During the conversation with Relator, Coleman stated, "I work for a bank.  I am employed by a bank.  It is my job to look out for their best interests."

341. Relator asked if Coleman had "an agency aspect" to his job, and Coleman said he did.

342. Relator objected, noting that they were both employees of LandSafe, a company that was supposed to provide independent valuations of property.  Specifically, Relator stated, "But we work for LandSafe."

343. Coleman responded, "But BofA signs my checks."

344.   Relator possesses numerous examples of similar property appraisals that were improperly done at the direction of LandSafe.  He accumulates more examples every day.

## LandSafe Retaliates Against Relator

345.   In approximately March of 2011, Relator informed management he would no longer be completing appraisals using the misleading and non USPAP compliant methodologies provided by management in the completion of REO valuation assignments.  Relator cited the "Letter of Engagement", "Scope of Work" and "Report Expectations ("LOE documents") provided with each appraisal assignment as providing specific instructions on how to complete these reports. The instructions on these documents directly contradicted the instructions provided by management locally and in Texas.

346.   LandSafe management retaliated against relator by cancelling 18 orders from his queue the following day.  Relator has not, to this day, been recompensed for the loss of the orders.

## Bank Of America Maintains An Unacceptable Vendor List (Uvl) Of Appraisers

347.   Bank of America established and currently maintains the Bank of America Watch List Manager that lists appraisers the Bank finds to be "unacceptable."  Vendor Management Companies and other entities that employ appraisers have policies and/or practices that disallow the employment of appraisers listed as "unacceptable"  on the Bank of America Watch List Manager.

348.   The Watch List Manager serves as a "black list" and, in practice, works as a mechanism that retaliates against appraisers who advocate for Defendants to conduct their  appraisal practices properly.

349.   Though several pages of policy exist that suggest the Watch List exists to identify and remove appraisers who perform poor quality and non-USPAP compliant work, the Watch List Manager mechanism is, in actuality, highly flawed, subjective, and can result in competent appraisers being removed from assignment opportunities.

350.   LandSafe Review Policy rates appraisals from 1 to 5, with "1" representing a significantly deficient appraisal and "5" representing the maximum score an appraisal can achieve.

351.   The review of appraisals is conducted by a nationwide panel of review appraisers.

352.   LandSafe does not require members of its review panel to be geographically competent for the appraisals they review.

353.   LandSafe does not require reviewers to be licensed in the state in which the appraisal is performed (with the notable exception of approximately seven or eight "locked" states).

354.   Many LandSafe reviewers have no basic understanding of market dynamics making it impossible for them to gauge market reaction to particular  properties.

355.   Relator has received a score of "1" on two different appraisals in the four years he has worked at LandSafe.  Those deficient scores were issued by two different review appraisers  - one who was not geographically competent to value a

particular property and a second appraiser who had no understanding of market dynamics.

356.    A rating of 1 results in significant monetary fine and reduction of availability of work for the appraiser.

357.    It was through the process of receiving two low scores on his appraisals that Relator learned the Bank tracked unapproved or unwanted appraisers via a data base.  Relator was informed that additional low ratings could cause the Relator to be placed in the data base, which is also known as the Watch List Manager.

358.    Relator subsequently reviewed documents pertaining to the Watch List Manager on the Bank of America policy and procedure portals.

359.    According to BoA policy documents, the Watch List Manager is a vendor provided database available to various banks.  This data base identifies and tracks black listed appraisers within the industry.  Inclusion on this data base would logically result in a significantly diminished opportunity for work in the mortgage related valuation field.

360.    Although there are mechanisms specified in the Defendants' policies to remove an appraiser from the "black list," in practice, this is nearly impossible to achieve due to bias inherent in the implementation of the apparatus.


**Hillcrest Ave.**

361.    Also in March of 2011 Relator inspected 2871 Hillcrest Ave, Rocklin, CA and was informed by Realtor there were significant settlement issues at the southwest corner of the living room that was resulting in large cracks and damage to the structure.

LandSafe Appraisal refused to allow Relator to complete the report subject to inspection and repair of this settlement issue. LandSafe ordered a replacement appraisal that glosses over the settlement issue and fails to analyze market reaction to this significant issue.

362.   The subject was identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness or structural integrity of the property. Furthermore, the report falsely indicated that the subject generally conformed to the neighborhood in terms of functional utility, style, condition, use, and construction etc. Marking the report in this fashion obscures the subject's true condition and conformity, and clearly results in a misleading report.

363.   Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

364.   The subject was listed for over 424 days, and the listing expired on 05/03/2011 without a sale. The property is now sitting vacant and unmarketed since 05/03/2011, (another 90+ days). This property will not sell at market value and will require significant discounting to liquidate.

## Monteverde Drive

365.   On June 1, 2011, Relator inspected 3720 Monteverde Drive, Lincoln, CA. During research of the property, Relator discovered the subject was seriously behind on its Home Owner Association (HOA) dues and that this particular HOA had a history of requiring all HOA dues to be paid in full prior to close of escrow. It was unclear whether the homeowner, bank, or potential buyer were responsible for paying what was presumably thousands of dollars in arrears for HOA dues, assessments,

penalties and interest.  In practice, in situations like this, it often falls to the potential

buyer to bring all past due accounts current.  Market reaction can vary widely to this

responsibility.

366.    Relator attempted to get the balance due from the HOA collection agency and who

would be liable for the past due assessments, but the order was cancelled by district

manager Sutton before Relator could obtain this necessary information.  Relator's

discussions with Sutton revealed Sutton had no idea why Relator would even need to

obtain this information much less to analyze the market reaction for this assessment.

367.    A replacement appraisal ordered by LandSafe fails to identify, disclose and analyze

these assessments and their market reaction.  The subject property is still on the

market 90 days later and is assumed overvalued.


**Hill Road**

368.    On June 14, 2011, LandSafe assigned Relator to inspect 7850 Hill Road, Granite

Bay for a **refinance** transaction for Bank Of America.

369.    Upon arriving at the property, Relator found a completed approximately 1800 square

feet of residence and a large two story structure under construction that was to be an

eight car garage on the first floor with 900 square feet for apartments on the second

floor. above.

370.    During a conversation with the homeowner, Relator discovered the homeowner was

attempting to pull money out of the equity in his residence in order to finish the

construction.

371.   Relator told the homeowner that the normal requirements for Bank of America loans does not allow for incomplete construction to be underway at the time of the appraisal and that Relator would likely have to write the appraisal "subject to" the completion of the construction currently in process.

372.   This rule presented a dilemma for the borrower. The homeowner/borrower would not be able to access the money he needed to finish the construction without having the construction completed in the first place.

373.   Rather than completing an appraisal that would have been of no use to the borrower, Relator postponed the completion of the appraisal pending instruction from management.

374.   Relator proposed to management that someone from the lending department reach out to the client and offer a construction loan, personal loan, or some other loan product as a stop gap until the construction could be completed.  Relator proposed that then a new appraisal be performed that would include the completed improvements.

375.   Relator was instructed by LandSafe to complete the report "As-Is" and mark the 1004 form as such, but to employ a hypothetical assumption that there was no construction in process.

376.   Relator refused to mark the 1004 form as directed because complying with LandSafe's directive would have resulted in a misleading report.

377.   LandSafe responded by cancelling the report with the Relator with no compensation for work completed to date.

378.   LandSafe reordered the appraisal with staff appraiser Tom O'Brien.

379.   O'Brien completed the appraisal to in accordance with LandSafe's directives.

380.   The resulting appraisal was a fraudulent and misleading report because it failed to address the subject's improvements, a site use, and the problem of overimprovement for the market.

381.   O'Brien included no photos of the construction under way at 7850 Hill Road, hides the description in a section of the report that is usually used to describe the cost approach to value, and then references a long defunct provision of USPAP that had been removed over 5 years ago. (the "departure provision") in a haphazard attempt to support the obvious contradictions inherent in the report that violate USPAP. (Standards 1, 2, and the Ethics provision)

382.   This now defunct provision in the 2005 USPAP allowed an appraiser to deviate from USPAP requirements under certain situations. The provision was retired with the very next publishing of USPAP.

383.   The departure provision was replaced by the "jurisdictional exception rule" which states:

If any applicable law or regulation precludes compliance with any part of USPAP, only that part of USPAP becomes void for that assignment. In an assignment involving a jurisdictional exception, an appraiser must:

identify the law or regulation that precludes compliance with USPAP;
comply with that law or regulation;
clearly and conspicuously disclose in the report the part of USPAP that is voided by that law regulation; and
cite in the report the law or regulation requiring this exception to USPAP compliance

384.   In short, departure from any part of USPAP can only occur if there is a law or regulation that contradicts USPAP.  If no contradictory law or regulation exists, an

appraiser cannot deviate from USPAP. A client cannot dictate whether or not to adhere to USPAP.

385.   LandSafe's and O'Brien's failure to adhere to USPAP, and the obfuscation of the actual conditions and description of the site's improvements resulted in a misleading report of value for 7850 Hill Road to be used as part of fraudulent appraisal report that t was submitted by Defendant to Fannie Mae in direct violation of the warranties that were certified by BoA, This violation of USPAP requirements is a direct violation of Bank of America's written policies and GSE requirements. This conduct directly violated the warranties provided by Bank of America to the GSE's for participation in their programs, resulting in a false claim for federal funds.

386.   Because LandSafe and O'Brien issued a fraudulent and misleading appraisal, 7850 Hill Road wrongfully qualified for conventional (Fannie Mae and Freddie Mac) mortgage financing.

**Rolling Oaks Drive**

387.   On June 15, 2011, Relator inspected 4430 Rolling Oaks Drive, Granite Bay, CA and found significant incomplete construction, damage to an outbuilding, deferred maintenance, and water leaking from two upstairs heating ducts. Relator  stopped the report process and informed LandSafe that Relator  would need a contractor to inspect the FAU system and advise as to the cause of the leaks, the required repairs, and if there was any collateral damage (mold, etc.) as a result of introduction of water to the scuttle and/or ducting.

388.   LandSafe instead cancelled the appraisal with Relator and reordered it with another appraiser (non staff).  This appraisal fails to adequately address required repairs and

the market reaction to them and completely missed the water leaking from the upstairs ducting.  The property is still on the market 90 days later with no repairs having been completed and is assumed significantly overvalued due to expected required repairs.

**Relator's Appraisal Practices Draw Fire From Landsafe Management**

389.    From approximately March to June of 2011, Relator changed some of his practices and completed many appraisals that complied with the instructions given in these LOE documents.  LandSafe management and corporate offices repeatedly pressured Relator to resubmit the appraisals using misleading and fraudulent reporting techniques.

390.    Relator resisted the pressure to resubmit appraisals that were false and misleading.  Because LandSafe personnel could not point to a definitive company policy document that contradicted Relator, they relented and allowed Relator to complete the appraisals in the way Relator thought appropriate.

391.    This temporary lull changed in June of 2011, when Relator received a phone call from Melissa Entsminger, the Vice President in charge of the entire REO valuation department.

392.    Entsminger, who is reportedly an appraiser herself, called Relator to discuss the issues Relator raised with the LOE documents and wanted to know why Relator had several reports that had been completed "subject to."  Entsminger began the conversation in a cordial fashion but became hostile when Relator defended his actions and refused to complete the appraisals in a fraudulent fashion.

393.   During the conversation, Entsminger showed an alarming lack of knowledge

regarding current USPAP requirements and accepted appraisal methodology.  The

conversation ended with Entsminger asking Relator to send her an email outlining

Relator's understanding of the issues at hand and the proper way to resolve these

issues.  This email follows:

> "Ms Entsminger,
> I have spoken to Scott Sutton at length on this subject and he tells me your
> position is that the "Lender Specific Appraisal Assignment Conditions"
> section supersedes the scope of work and furthermore that the sentence
> stating as such, indicates all sections below (i.e. the remainder of the
> document) supersede the Scope of Work document. If this is indeed the
> case, then the situation is greatly simplified and in most instances an REO
> assignment can indeed be completed "As-is" when water or some types of
> structural concerns are noted by the appraiser. However in my opinion
> this is not very clear in the way the Letter of Engagement is composed. I
> have checked with another member of my team and both of us agree that it
> appears that if there were specific lender conditions that supersede other
> documents they should immediately follow this statement and be
> enumerated in some fashion. The way it reads currently, in my opinion, is
> telling the reader something to the effect that if there were superseding
> conditions they would be located here but since there isn't, were moving
> on to the next subject…. Namely FHA appraisals.
>
> Additionally, if the Letter of Engagement specifically supersedes the Scope
> of Work document, then why is the Scope of Work document even
> referenced in an REO Letter of Engagement? Shouldn't the Letter of
> Engagement be a self contained document? Or failing that, shouldn't
> there be a Scope of Work document that is specific to the REO valuation
> product? (like the Preforeclosure Drive by Scope of Work, if memory
> serves)
> Additionally, I brought up this issue to management over six months ago
> and this is the first I have heard of any "superseding language" argument.
> Instead I was told by management (including Steve Defoe) to mark the
> appraisal report "as-is" then apply the extraordinary assumption in the
> addenda and make sure the REOAD value matches the 1004 value. OREA
> considers this a misleading report since what you have done is indicate to
> the reader via the 1004 that the value is As-Is, then contradict that
> assertion in the addenda and indicate the value provided in the 1004 form
> is actually subject to
> h/c or e/a's. Further, you are supplying a "subject to" value in the
> REOAD form in place of the "as-is" value as specified by that form. This

*is considered misleading and a violation of ethics provisions and standards 2-1 and 2-2. The California*
*Office of Real Estate Appraisers will not put such opinions in writing unless a formal complaint is filed with their office and so I cannot provide you with a written account of my conversation with them, however, I suggest you call them and ask for yourself, they're real nice folks . Their number is 916-552-9000*

*Now to be clear, if the superseding language argument is considered the accurate interpretation of this letter of engagement (and in my opinion that instruction in the form is far from clear) then the whole issue is moot as article 7 of the scope of work would be superseded and would never come in to play. Most REO assignments would therefore be perfectly in compliance with USPAP in this regard as there would be no client restriction/instruction to mark the form "subject to" if water damage or structural concerns are noted, unless the scope or type of damage cannot be reasonably determined by the appraiser. In truth, in my experience it rarely happens that I cannot generate a reasonable cost to cure for damages noted on site.*

*If the superseding argument is upheld by governance, please let me know in writing as from that point on I will be able to put a copy of that notice in my work file along with the scope of work and letter of engagement documents and I would feel perfectly comfortable completing these assignments in the manner prescribed by these documents.*
*However, wouldn't it be better to simply have a revised REO valuation specific letter of engagement that is self contained and if necessary an accurate scope of work document that accurately represents the REO valuation product requirements?*

*Now, in following up on our conversation about using mechanical cost to cure adjustments in the sales comparison grid without proof the market reaction equals cost to cure like you asked me to, as I stated earlier, I checked this issue with John Brennan, and while his email specifically restricts my ability to quote or forward his response I can paraphrase it in this manner: I can confirm it is an unacceptable appraisal practice to equate cost to value. You are correct that any adjustment in the sales comparison approach must be derived from the market (emphasis added) and may be more or less than actual cost.*

*If you would like to ask him directly his email address is john@appraisalfoundation.org He too is a really nice guy and very willing to answer questions like this. Furthermore please see certification 9 on the 1004 and 2055 which states: "I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales. Using a cost to*

*cure adjustment in; my opinion, that of my peers, the Appraisal Foundation, the Appraisal Institute and the Office of Real Estate Appraisers, is an unacceptable appraisal practice that may be a USPAP violation unless it can be proven in the report or work file that cost to cure does equal market reaction. It would likely be classified a USPAP violation if the improper use of a mechanical adjustment schema resulted in a misleading report and in my opinion, in this market, this is almost a certain result as market reaction varies widely from actual costs involved in almost all situations.*

*Sorry to be so long winded, but it is 1:15am and I could not sleep due to this issue running round and round my poor brain pan. I wanted to get this information to you prior to your meeting with governance tomorrow morning (oops ..this morning) and figured it would be best to get this letter written now (since I could not sleep anyway) as I will be out of the office all day on appointments tomorrow. If there is some aspect of this issue you (or governance) wish to discuss further with me I would be happy to speak with you. I can be reached at 530-575-5531 tomorrow as many of the properties I will be inspecting are vacant REO properties.*

*I really do look forward to hearing the results of your meeting with governance. I suppose I also wanted to reach out and to let you know that my position was not arrived at lightly, rather it was the result of months of research and instruction from three levels of management and several RCA's in various states. I researched the situation with OREA, Appraisal institute and Appraisal Foundation members and several leading publications on the appraisal of real estate. I'm not just some troublemaker or idiot trying to be difficult. I really want to do what's right for the company and for our clients while protecting my own interests and license. I do hope you understand.*

*Respectfully,*

*Bob Madsen*

394.   The conversation with Entsminger ended with her referring Relator to Eric

Dagley, an appraiser in the Landsafe Governance Department who had been

instrumental in writing the original LOE documents.

395.   Relator had several conversations with Dagley.  Dagley requested Relator to

forward the email to Entsminger to Dagley, and Relator complied.

396.  Dagley acknowledged that the LOE documents had become cumbersome, unwieldy, inaccurate, and had several internal contradictions and errors.  Dagley stated "They [the LOE documents] had become a monster out of control."

397.  Dagley also stated that Dagley agreed with Relator's assessment of the documents' weaknesses, but stated, "I doubt I will do much about this because it isn't worth my time."

398.  Dagley told Relator that in the past Dagley had attempted to get similar issues resolved but that he had been labeled a "troublemaker" by management and that his persistence in correcting such matters had negatively impacted his career with LandSafe/Bank of America.

399.  Dagley said, "I don't think there's much political willpower to really get this done."

400.  Dagley did say, however, that he had been tasked with possibly reviewing and rewriting the LOE documents.  Relator offered assistance in this effort, and Dagley gratefully accepted. Dagley asked Relator to send Dagley an email describing the problems with the LOE documents.

401.  Relator informed his local management of the progress Relator had made to resolve the LOE document issues and sent Dagley the following email thread.

> *From: Madsen, Bob*
> *Sent: Wednesday, June 22, 2011 4:06 PM*
> *To: Dagley, Eric L*
> *Subject: RE: letter of engagement vs. scope of work clarification*
>
> *Eric,*
> *Thanks for taking the time to speak with me today. Just to follow up on our conversation. You have asked me to put together a concise listing of the concerns I have regarding the REO letter of engagement and the current 1004 scope of work document that is referenced by it, and to analyze the*

*contents and interactions of these two documents. This I will do as soon as time and work responsibilities permit. I hope to have it to you by the end of next week.*

*Additionally you requested I put in writing the following question; Is it the official position of Landsafe Appraisal management and therefore company policy that the REO Letter of Engagement document is considered to globally supersede the scope of work document that is specifically referenced in the body (by way of hyperlink) of the REO Letter of Engagement?*

*Please advise.*
*Thanks*
*Bob Madsen*

*From: Dagley, Eric L*
*Sent: Monday, June 20, 2011 2:54 PM*
*To: Madsen, Bob*
*Subject: RE: letter of engagement vs. scope of work clarification*

*It will be sometime tomorrow before I can dig into this. Many fires to put out today.*

*Eric Dagley*
*Senior Business Control Specialist*
*Home Loans Closing Services Governance - Valuations*
*My Work*
*®*
*Flexible Associate*
*7105 Corporate Dr.,Plano, TX 75024*
*Email: eric.dagley@LandSafe.com*

*From: Madsen, Bob*
*Sent: Monday, June 20, 2011 1:24 PM*
*To: Dagley, Eric L*
*Subject: FW: letter of engagement vs. scope of work clarification*

*Eric*
*Here is the email sent to Ms Entsminger. I look forward to hearing from you. I can be reached today at my home number 530-477-1679. Please don't hesitate to call.*

*Bob Madsen*

*[NOTE - The email to Entsminger appears next in the Dagley email but has been deleted for brevity's sake. The Entsminger email appears in its entirety earlier in this complaint.]*

402.    LandSafe conducted a staff conference call on 06/03/2011.  In the call, Relator was lauded by local management as discovering an apparent conflict between the Letter of Engagement and the Scope of Work Document.  Staff was informed that Governance and Relator would be working together to resolve the issue.

403.    Relator was not contacted again to resolve the LOE document issues.

404.    Another LandSafe staff conference call took place on 06/23/2011. In this call, the Regional Chief Appraiser assigned to REO Valuations, Steve Defoe, was a guest speaker.  Defoe informed LandSafe staff that the official position of LandSafe's REO Valuations was that the vague instructions provided by the Letter of Engagement were considered to supersede the more specific instructions provided by the Scope of Work document.  Defoe also stated that Governance was looking into rewriting the LOE documents, but there was no estimated deadline for the task to be completed.

405.    Approximately one week later, Eric Dagley and Melissa Entsminger were both terminated.  The time of termination is strikingly close in proximity to their efforts to change policy.

406.    No further progress has been made to resolve problems inherent in the LOE documents.

407.    Around the time of the 06/23/2011 staff call, Relator had several appraisal assignments underway in which the subject property evidenced either damages or complications that required additional research or documentation.  Relator put the

assignments on hold until Relator could obtain the required

information/documentation/or contractor inspections and bids.

408. Within days of the 6/23/2011 staff call, LandSafe canceled all of these pending

assignments to the Relator and reordered the same assignments through either fee

appraisers or realtors.

409. Relator has since obtained copies of these reports completed by other appraisers

from the LandSafe panel of fee appraisers (sub contractors), or in the case of one

report, completed by a realtor. Of approximately 20 orders reassigned, four have

not been reassigned to anyone, and twelve show evidence of significant errors and

overvaluation.

410. In other words, only 4 of twenty appraisals were completed in compliance with

USPAP.

411. Relator's review of these reports revealed a continuation of the same misleading

practices and methodologies complained of herein.

412. A short description of those reassignments follows.

**Bonanza Drive**

413. On 06/02/2011, Relator inspected 2665 Bonanza Drive, Rocklin CA for a REO

valuation for LandSafe Appraisal. Relator noted fairly extensive wood rot at a

window in the living room and at exterior siding and at a bathroom. The fireplace

was incompletely installed and missing trimwork. There were damaged cabinets,

stained carpet and outdated fixtures. At that time, pursuant to LandSafe

protocols, Relator stopped his inspection, took photos, and informed management

that contractor bids were needed for repairs in order to adequately valuate the

residence.  Relator was waiting on these contractor bids when LandSafe cancelled the assignment to Relator and reassigned Bonanza Street to be appraised by another appraiser.

414.   The replacement appraisal was completed and included the following errors.

415.   Appraiser fails to address subject's likely highest and best use as an investor/flip property.

416.   Appraiser uses a cost to cure adjustment in the sales comparison grid.

417.   The cost to cure figure is grossly underestimated and fails to address the necessity of several additional repairs.

418.   The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness or structural integrity of the property.

419.   The report falsely stated that the subject generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

420.   This appraisal is over valued to a significant degree.

421.   Relator determined the Bonanza Drive property, in its then present condition, would sell for between $190,000 to $200,000, and the most likely purchaser would be an investor contractor.  The replacement appraisal over valued the property at $220,000.

422.   Reliance on such a report when previously informed of the subject's true condition is an unsound and unsafe lending/banking practice.

423. On 08/31/2011 the price was revised to $199,900.

424. The property is now a pending sale, presumably to an investor, as of 09/08/2011

**Kaula Drive**

425. On 06/14/2011, Relator inspected 8327 Kaula Drive for an REO valuation for LandSafe Appraisal.  Relator noted significant water damage decking in rear yard, siding and trimwork.  Relator noted stained carpeting and required interior paint. There was a failed window at front bedroom and buckled floorboards in kitchen. Relator informed management of the problems with Kaula Drive and requested contractor's estimates for repairs because the work required discovering the cause of the water damage in the kitchen.  Determining the source of water damage is beyond the normal scope of work for an appraiser and would likely have necessitated invasive inspections.

426. Instead of obtaining information from a contractor about the repairs, LandSafe canceled the assignment to Relator and reassigned Kaula Drive to a fee panel appraiser.  Relator reviewed the reassigned appraisal and identified several problems with it:

- The intended use statement of appraisal contradicts itself in two places and contradicts the intended use statement of the letter of engagement.

- The appraisal improperly identified the highest and best use of the subject property and the potential buyer pool.  Subject property's most likely buyer would be an investor contractor due to condition of subject.

- There was no analysis of market motivation and discounting requirements of potential buyer pool.

- There was no mention of failed window at front bedroom.

- The estimated cost to cure the deficiencies was inadequate to effect repairs needed.

- There was no cost identified to replace rotted decking.

- There was no cost identified to replace a failed window.

- The report underestimated cost to repair rotted siding and trim work and to repaint the exterior.

- The repair costs of roof replacement had been severely underestimated.

- No thought was given to the repair of the cause of water damage in the kitchen.

- The report contained an inadequate description of subject condition at the time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject property.

- There is an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject property.  Essentially, the appraiser is assuming that the results of such an inspection would return a finding of "no repairs required."  This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report.  Furthermore, USPAP requires the effects of such assumptions on the opinion of value be clearly stated.  This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," this should have been prominently disclosed to show that the subject property discussed in the report as marked was ineligible for GSE related transactions

- The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness, or structural integrity of the property.

- The report falsely indicated that the subject property generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

427.  The subject property is over-valued by a significant amount in this report.

428.  Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

429.  Relator discussed the Kaula Drive appraisal with District Manager Sutton who agreed the appraisal was poorly done, inadequately described, and analyzed, and resulted in significant overvaluation.  However, Sutton took no action to reject the report or have a new appraisal performed.  As a result of Sutton's inaction, this faulty valuation was accepted and passed on through LandSafe to the bank.

430.  Review of the Kaula Drive replacement appraisal indicates an opinion of value of $272,000 and fails to adequately address and analyze market reaction to repairs

required.  The replacement appraisal identifies a total cost of repairs at $13,000, while contractor estimates obtained by the listing agent indicates $17213 in repairs.

431.   Neither of the repair figures includes the cost for replacement of roof or the cost of addressing the extensive rotted decking at the rear yard.

432.   Actual costs are estimated to be between $25,000 to $30,000.  The report fails to correctly identify the most likely purchaser as one with a commercial interest, such as an investor contractor, and that the subject does not qualify for conventional financing.

433.   Subject is currently pending sale at $250,000 and being bought by a corporate entity for rehabilitation into a board and care facility.  Buyer is using a corporate line of credit to purchase the residence, presumably as a result of this conventional financing disqualification.  It should be noted that during Relator's interview with the listing agent, he expressed his disbelief that the offer should be so high and implied that the buyer's were overpaying for the property presumably for reasons atypical to the market. (i.e. location and profitability of the planned business enterprise, i.e. board and care facility)

**Sunset Avenue**

434.   Another order to appraise 8878 Sunset Avenue, Fair Oaks was cancelled by LandSafe prior to Relator being able to inspect it in retaliation for Relator's complaints about improper appraisal practices.  As such, Relator has no experience with the subject property's condition or amenities.  A replacement appraisal was ordered that recommended a liquidation value of $108,000.  Apparently, the lien

holder did not take the advice to liquidate, and the listing expired on 05/30/2011.  To this date the subject has not sold and is not being actively marketed.

**Wexford Circle**

435.   On 06/14/2011, Relator inspected 6429 Wexford Circle the above property for a REO valuation for LandSafe Appraisal.  Relator noted significant water damage to the bathroom and dining room, excessively stained carpet, interior paint needed, and several black growths in bathroom.  Relator informed management and requested contractor's estimates for repairs as the work required discovering the cause of the water damage in the dining room ceiling.  Identifying the source of water damage is beyond the normal scope of work for an appraiser and would likely have involved invasive inspections.

436.   Instead of waiting for the above information, LandSafe cancelled the assignment to Relator and reassigned Wexford Circle to a fee panel appraiser.

437.   Relator reviewed the reassigned appraisal and identified the following errors.

- The intended use statement in the report does not match the intended use statement in the letter of engagement.

- Time adjustment was unsupported by market analysis.

- The use of a cost to cure adjustment in the market grid.

- There was no market support for the cost to cure adjustment.

- The report failed to identify suspected mold.

- The report failed to identify suspected water damage at the upstairs bathroom.

- The report failed to identify water damage at the dining room ceiling.

- The estimated cost to cure the deficiencies was inadequate to effect repairs.

- The report contained an inadequate description of the subject property's condition at the time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject property's condition.

- There was an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject.  Essentially, the appraiser assumed the results of such an inspection would return a finding of "no repairs required."

- This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report. Furthermore USPAP requires the effects of such assumptions on the opinion of value be clearly stated.  This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," this should have been prominently disclosed that the report as marked was ineligible for GSE related transactions.

- The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness, or structural integrity of the property.

- The report falsely stated that the subject properly generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.

438.   Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

439.   The subject property was over valued by a significant amount in this report.

440.   Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**5706 Almond**

441.   On 06/14/2011 Relator inspected 5706 Almond to perform a REO valuation for LandSafe Appraisal.  Relator noted the property was not in a habitable condition. Relator noted several illegal and decrepit additions to the rear of the residence that imparted significant functional obsolescence to the residence.  All interior materials and surfaces needed to be replaced.  There was no functioning plumbing onsite.  According to the realtor, the pipes had rusted closed, and the previous tenants were getting water via a garden hose from the neighbor.  There was no kitchen, and numerous plumbing, electrical and construction code violations.

442.   It was unclear at the time of inspection whether the subject property could be repaired or whether the most economical course of action would be to demolish the residence and sell the parcel for its land value as an improved lot.

443.    Relator requested contractor's bids be obtained for repairs in order to ascertain the economic feasibility of repair and to determine the economic contribution, if any, of the improvements *in situ*.   This would have been beyond the normal scope of work for an appraiser and would likely have involved invasive inspections, hence the requirement for contractor bids.

444.    Instead of waiting for the above information, LandSafe cancelled the assignment to Relator and reassigned Almond Avenue to a fee panel appraiser.

445.    Relator reviewed the reassigned appraisal and identified the following problems with it.

- The use of a cost to cure adjustment in the market grid.

- There was no market support for the cost to cure adjustment or explanation of how the adjustments were derived.

- The intended use statement of appraisal contradicts itself in two places and the intended use statement of the letter of engagement.

- The report improperly identified highest and best use analysis of the subject property and the potential buyer pool.

- The subject property's most likely buyer would be an investor contractor due to condition of subject.

- There was no analysis of market motivation and discounting requirements of potential buyer pool.

- The estimated cost to cure the deficiencies was inadequate to effect repairs.

- The subject property is falsely identified in the report as having no repairs required despite significant evidence to the contrary.

- The report contained numerous errors in the reporting of the subject property's construction materials and condition.

- No cost to cure was given to repair or replace plumbing.

- The report contained an inadequate description of subject condition at time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject.

- There is an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject.  Essentially, the appraiser is assuming that the results of such an inspection would return a finding of "no repairs required."  This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report. Furthermore, USPAP requires the effects of such assumptions on the opinion of value be clearly stated.  This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," it should have been prominently disclosed that the report as marked was ineligible for GSE related transactions

- The subject was identified on the first page of the URAR as having deficiencies or adverse conditions that would affect the livability, soundness or structural integrity of the property but fails to adequately address them.  Instead, the subject is identified as being in "deferred condition" with no definition of what "deferred condition" means.

- The report falsely stated that the subject generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

446.   The subject is severely over valued in this report.

447.   Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**Perraud Drive**

448.   On 06/09/2011, Relator inspected 100 Perraud Drive, Folsom CA, for an REO valuation for LandSafe Appraisal.  Relator noted bubbling paint at several areas of the exterior, a missing stove, a dripping faucet in master bath, and buckled and water damaged wood flooring in the master bedroom.   Estimates for repairs of these issues would have been beyond the normal scope of work for an appraiser and would likely have involved invasive inspections.

449.   Relator informed management of the issues and requested a contractor bid for the repairs and to identify the source of the water damage.

450.   Instead of waiting for the information from the contractor, LandSafe canceled the
       assignment to Relator and reassigned Perraud Drive to a fee panel appraiser.
       Review of this reassigned appraisal reveals the following issues:

- Cost to cure adjustment applied in the sales comparison grid.

- No market support for the cost to cure adjustment identified in the
  report.

- The stated cost to cure the deficiencies was understated with no
  thought given to repairing the cause of the damage

- The stove is noted as missing, but a replacement is not required by
  the appraiser.  The Universal Housing Code and GSEs require a
  functioning stove of some kind in the residence. Because the letter
  of engagement specifically states: "The intended use of this
  appraisal is for a conventional loan," a stove should have been
  required and noted on the REOAD form.

- The estimated cost to cure the deficiencies was severely
  underestimated to effect repairs.

- The report referenced "across the board" adjustments for condition
  with no bracketing comparable.

- The report contained an inadequate description of the subject
  property's condition at the time of inspection, what it would take to
  restore the subject to marketability, and how the market would
  perceive and react to the subject property in its then present
  condition.

- The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness, or structural integrity of the property.

- The report falsely indicated that the subject generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

- There is an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject.  Essentially, the appraiser is assuming that the results of such an inspection would return a finding of "no repairs required."  This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report. Furthermore, USPAP requires the effects of such assumptions on the opinion of value be clearly stated.  This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," it should have been prominently disclosed that the report as marked was ineligible for GSE related transactions.

- Subject is likely over valued by a significant amount in this report.

451.    Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

452.    Over three months later, the property is still "pending" and has not closed escrow.

**Rolling Oaks**

453.    On 06/21/2011, Relator inspected 4430 Rolling Oaks Drive for a REO valuation for LandSafe Appraisal. Relator noted several areas of incomplete construction and significant drywall damage to an outbuilding.  Relator also noticed water dripping from two air vents on the second floor.  Estimates for repairs of the water issue would have been beyond the normal scope of work for an appraiser and would likely have involved invasive inspections.

454.    Relator informed management of the issues with the property and requested contractor bids.

455.    Instead of waiting for the above information, LandSafe cancelled the assignment to Relator and reassigned the Rolling Oaks Drive property to a fee panel appraiser.

456.    Relator subsequently reviewed the reassigned appraisal and identified the following problems with the report:

- The intended use statements in the report contradict themselves and contradict the intended use statement contained in the letter of engagement

- Cost to cure adjustment applied in the sales comparison grid.

- The report contained no market support for the cost to cure adjustment

- The report revealed an improper selection of comparables (gla range over +/-600sf)

- Indicated costs to cure the deficiencies are understated with no thought given to repairing cause of water leaking and any damage that may have been caused by water over the course of a prolonged amount of time.

- The report included an inadequate description of the subject property's condition at time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject property in its then present condition.

- There is an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject. Essentially, the appraiser is assuming that the results of such an inspection would return a finding of "no repairs required." This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report. Furthermore, USPAP requires the effects of such assumptions on the opinion of value be clearly stated. This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," this should have been

prominently disclosed that the report as marked was ineligible for GSE related transactions.

- The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness, or structural integrity of the property. Furthermore, the report falsely indicated that the subject generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.

457.   Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

458.   The subject property is likely over valued by a significant amount in this report and may actually qualify for the wholesale/investor market based on expectations of market participants.

459.   Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**Deerwood Way**

460.   On 05/26/2011, Relator inspected 150 Deerwood Way for a REO valuation for LandSafe Appraisal.  Relator noted several areas of dry rot at exterior siding, poor condition of interior materials, missing safety railings at breakfast area and deck, exposed electrical and missing light fixtures.  In addition the subject's in-ground pool was covered over with a structure made of 2x4 wood and plastic sheeting. The wood structure covering the pool was not movable by one person.  The

sheeting was torn at one corner, and Relator could see that the pool was nearly

empty.  Relator could not see the overall condition of the pool.

461.   Relator notified management of the problems with the property and requested a

contractor be hired to remove the structure so that Relator could inspect the pool

or to provide permission to complete the report subject to the inspection of this

pool.

462.   This would have been beyond the normal scope of work for an appraiser and

would likely have involved invasive inspections, hence the requirement for

contractor bids.

463.   Steve Defoe, Regional Chief Appraiser for the REO department contacted Relator

via phone and email regarding this assignment.  The email thread is as follows

and shows Mr. Defoe's instructions to Relator to provide a fraudulent and

misleading report and Relator's response with several options available in order to

provide a USPAP compliant report that would not be misleading and would be

credible.

> *From: Madsen, Bob*
> *Sent: Wednesday, June 08, 2011 2:51 PM*
> *To: Defoe, Steve N*
> *Subject: FW: 16315253 / 150 Deerwood Way, Folsom, CA 95630*
>
> *Mr. Defoe,*
> *Thank you for the clarifications below. I just wanted to be sure I heard*
> *your instructions given to me last week.  Now that they have been*
> *confirmed in writing I must respectfully decline to follow your instructions*
> *as to do so would violate USPAP on several points. My research with the*
> *California "Office of Real Estate Appraisers", research of USPAP, and*
> *research with several SRA and SRPA appraisers including a USPAP*
> *certified instructor for the Appraisal Institute has indicated to follow your*
> *instructions would violate the Ethics Provision and Standards 2-1 and 2-2*
> *of USPAP. In short your instructions would result in a misleading report.*

*Per the scope of work document for this assignment: If there are signs of water damage or excessive dampness or structural integrity concerns, "mark the appropriate box", provide a comment describing the issue, and make the report "subject to repair" or "subject to inspection" in the Reconciliation Section.*

*As I consider an in ground pool a significant structural amenity, and :*
*1.    due to the lack of water in the pool and resultant danger of the pool "floating" or popping out of the ground,*
*2.    the current condition of the pool being covered by a permanent structure*
*3.    the obscured nature of the pool condition gives rise to structural integrity concerns of this amenity*

*It is my opinion the scope of work dictates that the property should be valuated subject to inspections and/or repairs. Pursuant to USPAP the application of these subject to conditions must be prominently displayed and not contradicted or obfuscated by marking the form one way indicating one definition of value and then indicating in addenda another definition of value is really being offered. Furthermore, contradicting a FNMA form is also considered a violation of USPAP. Hence the use of a "subject to" value when the form is asking for (and identified as) an as-is value would be considered an additional two instances of non USPAP compliance. (considering both the REOAD and 1004 forms)*

*Bank Policy also dictates: "official procedure for dealing with properties where an "as is" value cannot be determined is for the appraiser to call Landsafe immediately and inform us that an "as is" value is not possible. The appraiser should not proceed with the appraisal before notifying Landsafe. At that point, we inform the lender of the situation and they advise how they would like to proceed.*

*Apropos policy I have contacted landsafe management and received faulty instructions on how to proceed. In order to comply with USPAP, in my opinion the following must be done:*

*1.  value must be rendered subject to extraordinary assumption of inspection of subject pool will return with no findings of required repairs.*
*2.  mark the 1004 form as subject to extraordinary assumption.*
*3.  provide an "as is" value in the reconciliation section of the addenda intended to consider the uncertain nature of the condition of the pool and its expected influence on market reaction and hence market value.*
*4.  provide this same "as-is" value denoted in the textual addenda of the 1004 on the first*

113

*field of the REOAD, thereby providing congruity between the forms and analyses performed.*

*5. value on the reoad and the 1004 will not match and cannot match based on the above legal obligations.*

*Alternatively, a new scope of work document could be provided to me removing article 7 regarding structural integrity concerns or the client can have the permanent structure covering the pool removed so that I may have unfettered access to visually inspect the pool in situ. A third option is for the client to cancel the assignment. If the client cancels the assignment I would respectfully request a half fee of $235 be paid me to compensate for my time involved and inspections/research completed.*

*Please contact the Client, inform them of the situation and preferred remedies and advise how they wish to proceed.*
*Respectfully,*

*Bob Madsen*
*Landsafe Appraisal*


*From: Madsen, Bob [mailto:bob.madsen@landsafe.com]*
*Sent: Wednesday, June 08, 2011 9:58 AM*
*To: bobmadsen@att.net*
*Subject: FW: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*From: Defoe, Steve N*
*Sent: Wednesday, June 08, 2011 5:11 AM*
*To: Madsen, Bob*
*Subject: RE: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*Bob*

*As per our discussion of this afternoon regarding the referenced property and the issue with it's pool*

*Please complete the report "as is" Explain as you deem necessary about condition of pool and note Extraordinary Assumption exists that it is in average or useable/marketable condition give whatever contributory value is appropriate please be sure as is value on report equates to that on REO addendum you can note need for inspection of pool on addendum*


*Steve*

*From: Madsen, Bob*
*Sent: Tuesday, June 07, 2011 5:03 PM*
*To: Defoe, Steve N*
*Subject: RE: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*Please respond in writing so that I have something to reference in my*
*workfile. Ps. My cell phone doesn't work too well where I live.*

*Thanks*


*Bob*

*From: Defoe, Steve N*
*Sent: Tuesday, June 07, 2011 3:00 PM*
*To: Madsen, Bob; Sutton, R Scott*
*Subject: RE: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*Bob*

*Left voice mail for you earlier today. Will call again shortly*

*From: Madsen, Bob*
*Sent: Tuesday, June 07, 2011 2:42 PM*
*To: Defoe, Steve N; Sutton, R Scott*
*Subject: RE: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*I still have not heard from you with clarifications. This is now my third*
*attempt to contact you. Please advise.*

*From: Defoe, Steve N*
*Sent: Wednesday, June 01, 2011 1:56 PM*
*To: Madsen, Bob*
*Cc: bobmadsen@att.net; Entsminger, Melissa C*
*Subject: 16315253 / 150 Deerwood Way, Folsom, CA 95630*

*Hi Bob*

*I received a note from Fulfillment about the referenced property and an*
*issue with the appraisal regarding the subject's pool as below:*

*Per the Appraiser:*
*Subject has an in ground pool in rear yard that has been covered by a 2x4*
*construction and tarp cover that does not appear to be a removable item*
*(at least without the assistance of several hands) as such I cannot*
*ascertain the condition of the pool amenity or its contribution to value.*

*Therefore, the report must be completed subject to inspection of the pool by qualified tradespersons and the extraordinary assumption that the pool is in serviceable condition. . If the client wishes, the pool cover should be removed and a re-inspection completed .*
*AGAIN- AN "AS-IS'VALUE CANNOT BE DERIVED IN THE SUBJECT'S CURRENT CONDITION DUE TO THE POOL BEING SEMI-PERMANENTLY COVERED.*
*The "as is" value is obviously a key component of an REO report such as this. As per our phone conversation, In order to enable you to provide the value given the circumstance noted, please describe the current condition of the pool, make an Extraordinary Assumption that the pool is in useable condition and mark the report appropriately.*
*Let me know if any additional assistance needed.*

*Thanks!*
*Steve DeFoe*

464. Instead of having a contractor assess the necessary repairs, LandSafe canceled the assignment to Relator and reassigned 150 Deerwood Way to a fee panel appraiser.

465. Relator reviewed this reassigned appraisal and identified the following issues:

- The report contained an erroneous highest and best use analysis in light of potential buyer pool.  The most likely buyer for the subject property would be an investor/contractor.

- The report contained no analysis of the motivations of the subject property's most likely market and the discounting required.

- There was inadequate market support  and explanation of how adjustments were derived.

- The report's estimated cost to cure the deficiencies is inadequate to effect repairs.

- There was no mention of missing lights or exposed electrical.

- There was no mention of missing safety railings.

- There was no mention of dry rot at siding and trim work.

- There was no mention or cost to cure provided for completion of incomplete construction noted onsite.

- The report contained an inadequate description of the subject property's condition at the time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject property.

- There is an implied extraordinary assumption in the way the appraiser calls for a home inspection to determine "the actual condition" of the subject.  Essentially, the appraiser is assuming that the results of such an inspection would return a finding of "no repairs required."  This is a textbook example of an extraordinary assumption, and USPAP requires this assumption be clearly and conspicuously stated in the report. Furthermore, USPAP requires the effects of such assumptions on the opinion of value be clearly stated.  This was not done in this report.

- The report should have been marked "subject to" said inspections, or if the report was marked "as-is," it should have been prominently disclosed that the report as marked was ineligible for GSE related transactions

- The subject was falsely identified on the first page of the URAR as generally conforming to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report

in this fashion obscures the subject's true condition and conformity

and clearly results in a misleading report.

466.    The subject property is significantly over valued in this report.

467.    Reliance on such a report when previously informed of the subject's true condition

is clearly an unsound and unsafe lending/banking practice.

468.    Over three months later, the property is still "pending" and has not closed escrow.

**6063 Kenneth Oak**

469.    On 03/02/2011, Relator inspected 6063 Kenneth Oak for a REO valuation for

LandSafe Appraisal.  Relator noted water stains on the ceiling of one of the

upstairs bedrooms, and incomplete painting and child's graffiti in several rooms.

470.    Relator notified management of the problems with the property and requested a

contractor be hired to ascertain the cause of the water stains and any repairs

required.   This would have been beyond the normal scope of work for an

appraiser and would likely have involved invasive inspections, hence the

requirement for contractor bids.

471.    Instead of obtaining contractor bids, LandSafe cancelled the assignment to

Relator and reassigned the Kenneth Oak property to a fee panel appraiser.

472.    Relator reviewed the reassigned appraisal and identified the following issues:

- There was no mention of water stains in ceiling of upstairs bedroom

- There was no mention of torn vinyl in bathroom

- There was no mention of a missing switch and illegal wiring in the
  garage.

- The intended use statement contradicts the intended use statement included in the letter of engagement.

- The report included an inadequate description of subject property's condition at time of inspection, what it would take to restore the subject to marketability, and how the market would perceive and react to the subject.

- The cost to cure reported in the REOAD form is insufficient to effect repairs and restore this residence to full marketability.

- The subject was falsely identified on the first page of the URAR as having no deficiencies or adverse conditions that would affect the livability, soundness, or structural integrity of the property.

- The report falsely stated that the subject generally conformed to the neighborhood in terms of function, utility, style, condition, use, and construction etc.  Marking the report in this fashion obscures the subject's true condition and conformity and clearly results in a misleading report.

473.   The subject property was over valued in this report.

474.   Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**Flamingo Road**

475.   On 03/15/2011, Relator had an inspection scheduled to appraise 6234 Flamingo Road the above property for a REO valuation for LandSafe Appraisal.  Before Relator could complete that inspection, LandSafe cancelled the assignment from

119

Relator's work queue in a retaliatory gesture resulting from his refusal to provide misleading and fraudulent appraisals.

476.   This appraisal for Flamingo Road was reassigned to a fee panel appraiser.  It has been appraised twice since 03/2011.  Relator reviewed these appraisals and found the following errors.

- The description of adjustments applied did not match actual adjustments in the sales comparison grid.  The report contained no explanation of adjustments that are utilized.

- The cost to cure adjustment used on all comparables included no reference to or explanation of market reaction.

- Cost approach to value did not reflect market activity and is not analyzed correctly.

- Extraordinary assumptions applied in addenda are not marked on the 1004 form. The report should have been marked "subject to" said inspections, or if the report was marked "as-is," this should have been prominently disclosed that the report as marked was ineligible for GSE related transactions.

- The 1004MC is incorrectly filled out and not analyzed correctly, i.e. data presented indicates different conclusions than are marked. It should have been noted that the city of Rocklin is considered to be a declining market with some pockets of stability. It is not considered an increasing market at this time.

- The 30 day discounted figure reported on the REOAD is not adequate to affect a sale within the specified time frame.

- Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**Goldeneye Court**

477. On 03/09/2011, Relator had an inspection scheduled to appraise 6211 Goldeneye Court the above property for a REO valuation for LandSafe Appraisal. Before Relator could complete that inspection, LandSafe cancelled from Relator's work queue in a retaliation for Relator's refusal to provide misleading and fraudulent appraisals

478. The appraisal for Goldeneye Court was reassigned to two different fee panel appraisers for completion over the next four months. The first two reports completed by fee appraiser Levi Thomas are considered credible. However, LandSafe opted to have the property appraised by another appraiser. The most recent appraisal completed by Houman Sanjideh is not credible.

479. Relator reviewed the Sanjideh appraisal. While Relator is not in a position to comment on the accuracy of the all of the observations made in Sanjideh's report, Relator's review of this reassigned appraisal reveals the following problems:

- The intended use statement contradicts the intended use statement contained in the letter of engagement.

- The market analysis contained in the report is considered insufficient and incorrect and utilizes non relevant comparables.  The data utilized was too generalized to be relevant.

- Comparables presented in this report indicate a  lower value for the subject property than what was ultimately established.  In fact, this home was appraised twice before, and both reports indicated a value of $336,000, but this appraisal indicates a value of $365,000.

- The report should note this area of Rocklin is considered a declining to stable market, and property values did not increase over the past three months.

- The cost approach to value is erroneous and does not reflect market activity. No external economic obsolescence was applied.

480.  This report over valued the property by approximately 10-15%.

481.  Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**Thompson Circle**

482.  On 09/16/2010, Relator appraised 1026 Thompson Circle.  Relator noticed discolored vinyl flooring at master bath that indicated water damage. Relator's report addressed the issue.

483.  On 03/09/2011, Relator had an inspection scheduled to reappraise 1026 Thompson Circle for another REO valuation for LandSafe Appraisal.  Before Relator could complete the follow up inspection, LandSafe canceled the

assignment to Relator in retaliation for Relator's refusal to provide misleading and fraudulent appraisals

484.     The Thompson Circle appraisal was reassigned to a fee panel appraiser for completion.

485.     Because the Relator did not inspect the property in March 2011, Relator cannot ascertain the accuracy of the all of the observations made in the fee appraiser's report.  However, Relator's review of this reassigned appraisal reveals the following problems:

- There was no assignment-specific intended use statement included in the appraisal.

- There was no mention of the damaged vinyl in the master bath.

486.     The opinion of value is considered generally credible, but cost to cure referenced on the REAOD may be inaccurate.

487.     Reliance on such a report when previously informed of the subject's true condition is clearly an unsound and unsafe lending/banking practice.

**5065 Tuckerman**

488.     On 03/09/2011, Relator had an inspection scheduled to appraise 5065 Tuckerman for a REO valuation for LandSafe Appraisal.  Before Relator could complete that inspection, LandSafe canceled the assignment from Relator's work queue in retaliation for Relator's refusal to provide misleading and fraudulent appraisals

489.     The appraisal for Tuckerman was reassigned to a fee panel appraiser for completion.

490.   Because the Relator did not inspect the property in March 2011, Relator cannot ascertain the accuracy of the all of the observations made in the fee appraiser's report.  However, Relator's review of this reassigned appraisal reveals the following problems:

- There was no intended use statement included in the letter appraisal.

- The market analysis in the report was insufficient and incorrect.

- The opinion of value is considered generally credible, but a 30 day discount is insufficient to ensure a quick sale within 30 days time. Note: This property has been appraised twice by the same fee appraiser since 03/2011. Both reports exhibit the same deficiencies.

**Hidden Hills Drive**

491.   On 03/24/2011, Relator inspected 1848 Hidden Hills Drive for a REO valuation for LandSafe Appraisal. Relator noted evidence of water damage in the family room, and water damage and suspected mold at garage wall and ceiling near family room.  Relator was informed by realtor and homeowners that the center beam for the roofing trusses had warped several inches out of true over a period of time, and the warping had resulted in water damage and suspected damage to several rafters and trusses.

492.   Estimating repairs for these problems would have been beyond the normal scope of work for an appraiser and would likely have involved invasive inspections.

493.   Relator informed management of the problems and requested contractor
       bids.

494.   Instead of obtaining the contractor bids, LandSafe canceled the assignment to
       Relator in retaliation for his refusal to perform misleading and fraudulent
       appraisals.

495.   In June of 2011, LandSafe again assigned Hidden Hills to the Relator.  Prior to
       scheduling an inspection, Relator informed LandSafe of the problems noted on
       the previous inspection and again requested contractor bids be obtained.

496.   Instead of obtaining the contractor bids, LandSafe cancelled the order with the
       Relator and instead of obtaining an appraisal, placed an order with a realtor for a
       "Drive by Broker Price Opinion" report.

497.   A "Drive by Broker Price Opinion" ("BPO") valuation product is not performed
       by an appraiser, and there is no guarantee the person providing the report has any
       valuation training or experience.

498.   BPO report indicates subject is in good condition, and realtor did not note any
       needed repairs.

499.   Relator reviewed the BPO and found that no physical inspection was performed
       of the property and the realtor who provided the valuation was never informed of
       the subject's true condition.  As a result, the Hidden Hills property has been
       significantly over valued, and the report provided obscures the subject's true
       condition and conformity and clearly results in a misleading report.

500.   Reliance on such a report when previously informed of the subject's true condition
       is clearly an unsound and unsafe lending/banking practice.

**Shadow Inventory**

501.   Shadow inventory is not reported to the shareholders or disclosed in any way known to the Relator.

502.   Residences in "Shadow Inventory" are residences that are delinquent in their loans but have not been foreclosed on due to actions of forbearance on the part of the lender.  Even though a significant portion of these properties have been abandoned and are vacant, they are not reported as "Real Estate Owned" (a liability in financial reporting) to the shareholders because title on these properties is still being held in the name of the borrower.  Shadow inventory represents significant risk to the defendants' financial health and ultimately to their shareholders.

503.   In the case of overvalued defaulted properties, such as REOs and short sales, their true value is often only revealed at auction because the properties rarely appeal to retail purchasers and stay on the market for lengthy periods of time eventually reaching the auction houses only after lengthy and costly attempts at marketing through normal market channels have failed.

504.   Ultimately, the banks sell the properties at auction for even greater discounts than for which they would have been sold to investors or contractors on the wholesale market.

**Clouded Title**

505.   Relator has learned that title for subject properties are sometimes "clouded," meaning that there is a break in the chain of ownership that must be investigated before a proper appraisal can be conducted.  In these cases, correct ownership of

the property can be in question if a property has unclear title.  The property may

not be marketable, and as such may have no market value.

506.    Defendants discourage appraisers from identifying problems with the title of

subject properties, and if the appraiser points out a problem with title, Defendants

will remove the appraiser from the assignment and find another appraiser who

will overlook the problem with title.

507.    For example, Defendants assigned Relator to appraise 8328 Crestshire Circle. In

the process of researching the subject property, Relator discovered information

indicating a cloud on title. Ownership of this property is not clear, and the

property may not even be legally owned by Bank of America.  Yet, the property

was foreclosed on in August 2011.

508.    On October 21, 2011, Relator notified LandSafe that he would have to apply an

extraordinary assumption to the appraisal report that 8328 Crestshire Circle had

clear title.  He asked whether this would be acceptable to the client or if the client

wanted to cancel the order.   To date, Relator has not received clarification of title

or instructions to proceed with the assignment.

**<u>Retaliation</u>**

509.    Taking adverse action against an employee for adhering to regulatory

requirements is considered discrimination and/or retaliation.

510.    In response to Relator's attempts to make Defendants aware of these various

appraisal issues, Defendants have at  times canceled orders, reduced fees, and

removed Relator from eligibility to obtain work.  The net loss to the Relator

resulting from Defendant's actions in excess of $50,000.00.

511.   As detailed above, Defendant Bank of America obviously and directly retaliated against Relator for bringing his concerns forward.  Relator reported that Defendants were not in compliance with USPAP, the FHA, HUD, the VA, Fannie Mae, Freddie Mac, and other government regulations regarding appraisals and that Defendants' systemic practice of overvaluing REO properties represented a material financial risk for both the government plaintiffs and the companies' shareholders that needed to be remedied.

512.   To date, Relator has not been properly recompensed for his lost wages and the erroneous complaints attributed to him have not been removed from his file.

513.   Defendants have ignored Relator's insistence in making improvements on his own individually generated appraisals, and have not corrected their national policies and procedures to stop other appraisers from following LandSafe's unlawful appraisal practices.

514.   Bank of America announced on October 26, 2011, that it would cease providing closing services to non-Bank of America entities effective January 31, 2012. Bank of America stated that this change would allow LandSafe to focus efforts on Bank of America's direct –to-consumer channels.

## CLAIMS FOR RELIEF

### COUNT ONE
### False Claims Act, 31 U.S.C. §3729 (a)(1)(A)
### Presenting or Causing to Be Presented False Claims

515.   Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

516.     This is a civil action brought by Relator Madsen in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendant's violation of 31 U.S.C. §3729 *et seq.*

517.     Defendants concealed and conceal from the United States Government the fact that it has engaged in the submission of false claims and appraisals for reimbursement by the governments.

518.     By virtue of the above acts, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, and continues to do so at the present time, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

519.     At all times relevant and material to this Third Amended Complaint, Defendants knew that its business practices would necessarily result in material false claims, appraisals, records or statements being presented, paid and/or subsidized by the United States through the US Treasury, TARP, HAMP, FDICIA ,the Federal Reserve, FHA, VA, Freddie Mac, and Fannie Mae.  By its conduct, Defendants knowingly caused false statements, appraisals, and records to be made or used, and material facts to be omitted, to induce the United States Government to approve, subsidize and/or pay false and fraudulent claims.

520.     As Defendants' business practices extend throughout the country in states where government reimbursement rates make such fraud lucrative for the Defendants, the amounts of the false or fraudulent claims and appraisals submitted to the United States Government were material.

521.     The United States Government, being unaware of the falsity or fraudulence of the statements, records, or claims caused by, made, and submitted by Defendants, have funded in part, approved, and/or paid the false or fraudulent appraisals. But for the knowing and intentional conduct of Defendants, the false appraisals would not have been submitted. But for the knowing and intentional conduct of Defendants, the United States would not have provided funds to guarantee the properties and/or funded the false claims.

522.     From at least 2006 to the date of this Third Amended Complaint, by reason of the conduct described above, the government has been damaged in an amount that is believed to be in excess of several millions of dollars.

**COUNT TWO**
**False Claims Act, 31 U.S.C. §3729 (a)(1)(B)**
**Creation or Use of False Statements or Records Material to a False Claim**

523.     Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

524.     This civil action is brought by Relator Madsen in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 (a)(l) (B).

525.     By virtue of the above-described acts, among others, Defendants knowingly created or caused to be created, made, or used material false records or statements to get false appraisals claims to be paid, funded, guaranteed and/or subsidized by the United States.

526.     At all times relevant and material to this Third Amended Complaint, Defendants knew that its business practices would necessarily result in the creation, making,

130

or use of material false records or statements to get false claims to be paid and/or subsidized by the United States through the US Treasury, TARP, HAMP, FDICIA,  the Federal Reserve,  FHA, VA, Freddie Mac, and Fannie Mae.  By its conduct, Defendants knowingly created and caused to be created material false statements and records to be made or used, and material facts to be omitted, to induce the United States Government to approve, subsidize and/or pay false and fraudulent claims.

527.  The United States Government, being unaware of the falsity or fraudulence of the statements, records, or claims which Defendants caused to be made, used, or presented, approved, subsidized and/or paid the false or fraudulent claims for bogus admissions

528.  Because Defendants' business practices extend throughout the country, the amounts of the false or fraudulent claims submitted to and/or subsidized by the United States Government were material.

529.  From at least 2004 to the date of this Third Amended Complaint, by reason of the conduct described above, the government has been damaged in an amount that is believed to be in excess of several millions of dollars as a result of misuse of federal bailout money.


### COUNT THREE
**False Claims Act, 31 U.S.C. §3729 (a)(1)(C)**
**Conspiracy**

530.  Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

531.   This civil action is brought by Relator Madsen in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 (a)(l)(C).

532.   By its conduct, Defendants knowingly caused false statements and records to be made or used, and material facts to be omitted, to induce the United States Government to approve, subsidize, guarantee, and/or pay false and fraudulent claims and appraisals.

533.   The United States Government, being unaware of the falsity of the claims that Defendants made, has approved, subsidized and/or paid false or fraudulent claims, whereby the Government has paid substantial amounts from the US Treasury to Defendants.

534.   As Defendants' business practices extend throughout the country, the amounts of the false or fraudulent claims and appraisals submitted to the government and government sponsored entities is material, and in excess of $25 billion dollars.

## COUNT FOUR
### Violations of FCA Section 3730(h) by Defendants

535.   Plaintiffs incorporate by reference and re-allege all of the foregoing paragraphs as if fully set forth herein.

536.   The FCA, 31 USC 3730(h) provides as follows:

> Any employee who is *discharged, demoted,* suspended, *threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer* because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same

seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

537.   For reasons stated above, the BANK OF AMERICA Defendants violated FCA Section 3730(h) by retaliating against Relator by demoting, harassing and hindering his employment because of his lawful acts in furtherance of an action under this section, including initiating and conducting investigations of Defendants' violations of the FCA explained herein, and Relator is entitled to all relief necessary to make him whole.

## COUNT FIVE
### Violation of the New York False Claims Act
### New York Finance Law, Article 13, §§187 et seq.
### Presenting or Causing to Present a False Claim For Payment or Approval

538.   Plaintiffs incorporate by reference and re-allege all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Relator in the name of the State of New York under the *qui tam* provisions of the New York False Claims Act, New York Finance Law, Article 13, §§187 et seq.

539.   By virtue of the above-described acts, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continues to cause to be submitted false or fraudulent claims and appraisals by Defendants for payment or approval, directly or indirectly, to officers, employees or agents of the State of New York.

540.   Plaintiff State of New York, unaware of the falsity of the claims and/or statements caused to be made by Defendants and in reliance on the accuracy thereof, approved claims that would otherwise not have been allowed.

541.   The amounts of the false or fraudulent claims caused by the Defendants to be submitted to the State of New York were material.   By reason of Defendants' wrongful conduct, the State of New York has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the New York False Claims Act, to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each such false claim caused to be submitted by Defendants.

542.   Relator avers that he is the original source of the facts and information on which this action is based.

## COUNT SIX
### Violation of New York False Claims Act
### New York Finance Law, Article 13, §189(1)(b)
### *Making, Using or Causing to Be Made or Used False Statements or Records Material to a False Claim*

543.   Plaintiffs incorporate by reference and re-allege all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Relator in the name of the State of New York under the *qui tam* provisions of the New York False Claims Act, New York Finance Law, Article 13, §§187 et seq.

544.   By virtue of the above-described acts, Defendants knowingly caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the State of New York, and continues to make, use or cause false

records and statements to be made or used to get false or fraudulent claims paid or approved by the State of New York.

545.  Plaintiff State of New York, unaware of the falsity of the records and/or statements caused to be made and used by Defendants and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims that were fraudulent and would not have been paid or approved if any part of the truth were known.

546.  The amounts of the false or fraudulent claims caused by the Defendants to be submitted to the State of New York were material.   By reason of Defendants' wrongful conduct, the State of New York has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the New York False Claims Act, to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each such false statement caused to be made or used by Defendants.

547.  Relator avers that he is the original sources of the facts and information on which this action is based.

**COUNT SEVEN**
**Violation of New York False Claims Act**
**New York Finance Law, Article 13, §189(1)(c)**
*Conspiracy*

548.  Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs as if fully set forth herein.  Defendants entered into conspiracies for the purpose of defrauding the Plaintiff State of New York.

549.   By the foregoing acts and omissions, Defendants took actions in furtherance of their conspiracies.

550.   By the foregoing acts and omissions, Defendants entered into these unlawful conspiracies to defraud the State and investors by causing false and fraudulent claims to be paid and approved in violation of the New York False Claims Act, New York Finance Law, Article 13, §§187(1)(c) and several other state statutes.

551.   At all times relevant to the Third Amended Complaint, Defendants acted with the requisite knowledge.

552.   As a direct and proximate consequence of Defendants' conspiratorial conduct, the State of New York has suffered significant, material financial damages in an amount to be proved at trial.

**COUNT EIGHT**
**Violation of the California False Claims Act**
**Ca. Gov't Code §12651(a)(1)**
***Presenting or Causing to Present a False Claim for Payment or Approval***

553.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

554.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

555.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

556.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

557.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

558.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

559.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

560.    Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions, lending, and property values in order to obtain and retain State funds.

561.    Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

562.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT NINE**
**Violation of the California False Claims Act**
**Ca. Gov't Code §12651(a)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*

*Material to a False Claim*

563.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

564.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

565.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

566.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

567.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

568.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

569.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

570.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

571.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved

these claims and/or would not have continued to approve these claims.

572.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


### COUNT TEN
### Violation of the California  False Claims  Act
### Ca. Gov't  Code §12651(a)(3)
### *Conspiracy*


573.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

574.   Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

575.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


### COUNT ELEVEN
### Violation of the California False Claims  Act
### Ca. Gov't  Code §12651(a)(7)
### *Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

576.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

577.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

578.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

579.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

580.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

581.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

582.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

583.    Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

584.    Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

585.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWELVE**
**Violation of the Delaware False Claims Act**
**Del. Code Tit. VI. §1201(a)(1)**
***Presenting or Causing to Present a False Claim for Payment or Approval***

586.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

587.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

588.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

589.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

590.   At all times relevant to this Third Amended Complaint, Defendants either presented false lending and property values to the Plaintiff State.

591.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

592.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

593.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

594.   The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

595.   Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

596.   Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

597.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT THIRTEEN**
**Violation of the Delaware False Claims Act**
**Del. Code Tit. VI. §1201(a)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

598.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

599.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

600.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

601.  At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

602.  At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

603.  Defendants presented false accounting information and prospectuses to the State Plaintiff.

604.  Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

605.  Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

606.  Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

607.  As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT FOURTEEN**
**Violation of the Delaware False Claims**
**Act, Del. Code Tit. VI §1201(a)(3)**
*Conspiracy*

608.  All of the preceding paragraphs are reincorporated and realigned by reference, herein.

609.   Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

610.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT FIFTEEN**
**Violation of the Delaware False Claims Act**
**Del. Code Tit. VI. §1201(a)(7)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

611.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

612.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

613.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

614.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

615.   At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

616.   As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

617.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

618.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

619.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

620.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


## COUNT SIXTEEN
### Violation of the District of Columbia False Claims Act
### D.C. Code §2-308.14(a)(1)
#### *Presenting or Causing to Present a False Claim for Payment or Approval*

621.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

622.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

623.  At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

624.  At all times relevant to this Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

625.  At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

626.  As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

627.  The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

628.  Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

629.  Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

630.  As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT SEVENTEEN**
**Violation of the District of Columbia False Claims Act**
**D.C. Code §2-308.14(a)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

631.  All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

632.  At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

633.  At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

634.  At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the Plaintiff State held by the Defendants.

635.  At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

636.  Defendants presented false accounting information and prospectuses to the State

Plaintiff.

637.  Based on these false statements, the Plaintiff State contracted with the Defendants

to invest in the Defendants.

638.  Defendants intentionally concealed its true financial status and health to the

Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

639.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

640.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

## COUNT EIGHTEEN
### Violation of the District of Columbia False Claims Act
### D.C. Code §2-308.14(a)(3)
#### *Conspiracy*

641.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

642.   Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

643.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

## COUNT NINETEEN
### Violation of the District of Columbia False Claims Act
### D.C. Code §2-308.14(a)(7)
#### *Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

644.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

645.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values thoroughly and accurately.

646. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

647. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

648. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

649. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

650. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

651. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

652. Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued

to approve these claims.

653.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT TWENTY**
**Violation of the Florida False Claims Act**
**Fl. Stat. §68.082(2)(a)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

654.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

655.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

656.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

657.    At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

658.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

659.    As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

660. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

661. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

662. Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

663. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY ONE**
**Violation of the Florida False Claims Act**
**Fl. Stat. §68.082(2)(b)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

664. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

665. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

666. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

667. At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

668. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

669. Defendants presented false accounting information and prospectuses to the State Plaintiff.

670. Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

671. Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

672. Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

673. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY TWO**
**Violation of the Florida False Claims Act**
**Fl. Stat. §68.082(2)(c)**
*Conspiracy*

674. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

675. Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

676.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY THREE**
**Violation of the Florida False Claims Act**
**Fl. Stat. §68.082(2)(g)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

677.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

678.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

679.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

680.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

681.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

682.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

683.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

684.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

685.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

686.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY FOUR**
**Violation of the Hawaii False Claims Act**
**Haw. Rev. Stat. §661-21(a)(1)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

687.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

688.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

689.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

690.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

691.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

692.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

693.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

694.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

695.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

696.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY FIVE**

## Violation of the Hawaii False Claims Act
## Haw. Rev. Stat. §661-21(a)(2)
### *Making, Using, or Causing to be Made or Used False Statements or Records Material to a False Claim*

697.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

698.    At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

699.    At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

700.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

701.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

702.    Defendants presented false accounting information and prospectuses to the State Plaintiff.

703.    Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

704.    Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

705.    Had the Defendants not submitted these false and/or fraudulent records and

statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

706.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY SIX**
**Violation of the Hawaii False Claims Act**
**Haw. Rev. Stat. §661-21(a)(3)**
*Conspiracy*

707.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

708.    Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

709.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT TWENTY SEVEN**
**Violation of the Hawaii False Claims Act**
**Haw. Rev. Stat. §661-21(a)(7)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

710.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

711.    At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

712.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

713.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

714.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

715.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

716.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

717.    Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

718.    Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

719.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

## COUNT TWENTY EIGHT
### Violation of the Illinois False Claims Act
### 740 ILCS 175/3(a)(1)(A)
*Presenting or Causing to Present a False Claim for Payment or Approval*

720.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

721.    At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

722.    At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

723.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

724.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

725.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

726.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

727.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

728.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

729.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT TWENTY NINE**
**Violation of the Illinois Whistleblower Reward and Protection Act**
**740 ILCS 175/3(a)(1)(B)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

730.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

731.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

732.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

733.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

734.   At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

735.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

736.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

737.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

738.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

739.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT THIRTY**
**Violation of the Illinois Whistleblower Reward and P1·otection Act,**
**740 ILCS 175/3(a)(1)(C)**
*Conspiracy*

740.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

741.   Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

742.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT THIRTY ONE**
**Violation of the Illinois False Claims Act**
**740 ILCS 175/3(a)(1)(G)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to*
*conceal, avoid, or decrease an obligation to pay or transmit money or property to the*
*state or any political subdivision*

743.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

744.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

745.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

746.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

747.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

748.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

749.   The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

750.   Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to wrongfully obtain and

retain State funds.

751.   Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

752.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

## COUNT THIRTY TWO
### Violation of the Indiana False Claims and Whistleblower Act
### Ind. Code §5-11-5.5 -2(b)(1) and (8)
### *Presenting or Causing to Present a False Claim for Payment or Approval*

753.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

754.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

755.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

756.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

757.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

758.    As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

759.    The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

760.    Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

761.    Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

762.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT THIRTY THREE**
**Violation of the Indiana False Claims and Whistleblower Act**
**Ind. Code §5-11-5.5 -2(b)(2) and (8)**
*Making, Using, or Causing to be Made or Used False Statements or Records*

164

*Material to a False Claim*

763.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

764.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

765.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

766.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

767.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

768.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

769.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

770.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

771.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved

these claims and/or would not have continued to approve these claims.

772.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT THIRTY FOUR**
**Violation of the Indiana False Claims and Whistleblower Act**
**Ind. Code §5-11-5.5-2(b)(7)**
***Conspiracy***

773.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

774.    Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

775.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT THIRTY FIVE**
**Violation of the Indiana False Claims Act**
**Ind. Code §5-11-5.5-2(b)(6) and (8)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to***
***conceal, avoid, or decrease an obligation to pay or transmit money or property to the***
***state or any political subdivision***

776.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

777.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

778.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

779.  At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

780.  At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

781.  As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

782.  The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

783.  Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

784.  Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

785.  As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT THIRTY SIX**
**Violation of the Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12 §5B(1)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

786.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

787.    At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

788.    At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

789.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

790.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

791.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

792.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

793.    Defendants knowingly and intentionally submitted these false and/or
        fraudulent claims regarding transactions in order to obtain and retain State
        funds.

794.    Had the Defendants not submitted these false and/or fraudulent claims, the
        State would not have approved these claims and/or would not have continued
        to approve these claims.

795.    As a result of the knowing and intentional acts of the Defendants, the State
        Plaintiff has been damaged.


                        **COUNT THIRTY SEVEN**
              **Violation of the Massachusetts False Claims Act**
                    **Mass. Gen. Laws. ch. 12 §5(B)(2)**
    ***Making, Using, or Causing to be Made or Used False Statements or Records***
                      ***Material to a False Claim***

796.    All of the preceding paragraphs are reincorporated and realigned by reference,
        herein.

797.    At all times relevant to this Third Amended Complaint, Defendants had a
        contractual obligation to report lending information and property values
        thoroughly and accurately.

798.    At all times relevant to this Third Amended Complaint, Defendants presented
        false lending information and property values to the Plaintiff State.

799.    At all times relevant to this Third Amended Complaint, Defendants had an
        obligation to render true and accurate periodic accountings with respect to the
        property of the Plaintiff State held by the Defendants.

800.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

801.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

802.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

803.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

804.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

805.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT THIRTY EIGHT**
**Violation of the Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12 §5B(3)**
*Conspiracy*

806.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

807.   Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

808.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

## COUNT THIRTY NINE
### Violation of the Massachusetts False Claims Act
### Mass. Gen. Laws ch. 12 §5B(7)
*Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

809.    All of the preceding paragraphs are reincorporated and realigned by reference, herein.

810.    At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

811.    At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

812.    At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

813.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

814.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

815.    The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

816.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

817.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

818.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FORTY**
**Violation of the Minnesota False Claims Act**
**Minn. Stat. § 15C.02(a)(1)**
***Presenting or Causing to Present a False Claim for Payment or Approval***

819.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

820.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

821.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

822.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

823. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

824. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

825. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

826. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

827. Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

828. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FORTY ONE**
**Violation of the Minnesota False Claims act**
**Minn. Stat. § 15C.02(a)(2)**
***Making, Using, or Causing to be Made or Used False Statements or Records***
***Material to a False Claim***

829. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

830. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

831. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

832. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

833. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

834. Defendants presented false accounting information and prospectuses to the State Plaintiff.

835. Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

836. Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

837. Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

838.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT FORTY TWO**
**Violation of the Minnesota False Claims Act**
**Minn. Stat. § 15C.02(a)(3)**
*Conspiracy*

839.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

840.   Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

841.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT FORTY THREE**
**Violation of the Minnesota False Claims Act**
**Minn. Stat. § 15C.02(a)(7)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to*
*conceal, avoid, or decrease an obligation to pay or transmit money or property to the*
*state or any political subdivision*

842.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

843.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

844.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

845.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

846.    At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

847.    As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

848.    The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

849.    Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

850.    Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

851.    As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FORTY FOUR**
**Violation of the Montana False Claims Act**
**Mont. Code Ann. 17-8-403(2)(a)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

852.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

853.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

854.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

855.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

856.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

857.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

858.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

859.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State

funds.

860.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

861.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

### COUNT FORTY FIVE
### Violation of the Montana False Claims Act
### Mont. Code Ann. 17-8-403(2)(b)
### *Making, Using, or Causing to be Made or Used False Statements or Records Material to a False Claim*

862.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

863.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

864.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

865.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

866.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

867.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

868.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

869.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

870.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

871.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT FORTY SIX**
**Violation of the Montana False Claims Act**
**Mont. Code Ann. 17-8-403(2)(c)**
***Conspiracy***

872.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

873.   Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

874.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FORTY SEVEN**
**Violation of the Montana False Claims Act**
**Mont. Code Ann. 17-8-403(2)(g)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision***

875.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

876.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

877.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

878.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

879.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

880.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

881.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

882.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and

retain State funds.

883.    Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

884.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT FORTY EIGHT**
**Violation of the Nevada False Claims Act**
**Nev. Rev. Stat. §357.040(1)(a)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

885.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

886.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

887.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

888.    At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

889.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

890.    As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

891. The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

892. Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

893. Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

894. As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

## COUNT FORTY NINE
### Violation of the Nevada False Claims Act
### Nev. Rev. Stat. §357.040(1)(b)
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

895. All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

896. At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

897.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

898.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

899.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

900.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

901.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

902.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

903.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

904.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FIFTY**
**Violation of the Nevada False Claims Act**
**Nev. Rev. Stat. §357.040(1)(c)**
*Conspiracy*

905.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

906.    Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

907.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT FIFTY ONE**
**Violation of the Nevada False Claims Act**
**Nev. Rev. Stat. §357.040(1)(g)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to*
*conceal, avoid, or decrease an obligation to pay or transmit money or property to the*
*state or any political subdivision*

908.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

909.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

910.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

911.    At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

912.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

913.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

914.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

915.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

916.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

917.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT FIFTY TWO**
**Violation of the New Hampshire False Claims Act**
**N.H. Rev. Stat. § 167:61-b(I)(a)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

918.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

919.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values

thoroughly and accurately.

920.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

921.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

922.   At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

923.   As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

924.   The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

925.   Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

926.   Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

927.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT FIFTY THREE**
**Violation of the New Hampshire False Claims Act**
**N.H. Rev. Stat. § 167:61-b(I)(b)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

928.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

929.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

930.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

931.    At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the Plaintiff State held by the Defendants.

932.    At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

933.    Defendants presented false accounting information and prospectuses to the State

Plaintiff.

934.    Based on these false statements, the Plaintiff State contracted with the Defendants

to invest in the Defendants.

935.    Defendants intentionally concealed its true financial status and health to the

Plaintiff State because if Defendants had not concealed such information, the

Plaintiff State would not have authorized investments in the Defendants.

936.    Had the Defendants not submitted these false and/or fraudulent records and

statements regarding its financial health, the State would not have approved

these claims and/or would not have continued to approve these claims.

937.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


## COUNT FIFTY FOUR
### Violation of the New Hampshire False Claims Act
### N.H. Rev. Stat. § 167:61-b(I)(c)
### *Conspiracy*

938.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

939.    Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

940.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


## COUNT FIFTY FIVE
### Violation of the New Hampshire False Claims Act
### N.H. Rev. Stat. § 167:61-b(I)(e)
### *Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision*

941.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

942.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values
thoroughly and accurately.

943.   At all times relevant to this Third Amended Complaint, Defendants presented
false lending information and property values to the Plaintiff State.

944.   At all times relevant to this Third Amended Complaint, Defendants had an
obligation to render true and accurate periodic accountings with respect to the
property of the State Plaintiff held by the Defendants.

945.   At all times relevant to this Third Amended Complaint, Defendants did render
periodic accountings with respect to the property of the State Plaintiff held by
the Defendants.

946.   As alleged above, Defendants knowingly and intentionally failed to report the
true nature of its financial health and its real estate dealings, and thereby
presented or caused to be presented false and fraudulent claims for transactions
and investments rendered on behalf of the State Plaintiff.

947.   The false and/or fraudulent claims regarding the value of investments made on
behalf of the State Plaintiff were presented to the State Plaintiff in the periodic
accountings Defendants was required to render pursuant to agreements in place
between the Defendants and the State Plaintiff.

948.   Defendants knowingly and intentionally submitted these false and/or
fraudulent claims regarding transactions in order to wrongfully obtain and
retain State funds.

949.   Had the Defendants not submitted these false and/or fraudulent claims, the
State would not have approved these claims and/or would not have continued

to approve these claims.

950.     As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT FIFTY SIX**
**Violation of the New Jersey False Claims Act**
**N.J. Stat. Ann. § 2A:32C-3(a)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

951.     All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

952.     At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

953.     At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

954.     At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

955.     At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

956.     As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

957.     The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

958. Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

959. Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

960. As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

### COUNT FIFTY SEVEN
### Violation of the New Jersey False Claims Act
### N.J. Stat. Ann. § 2A:32C-3(b)
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

961. All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

962. At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

963. At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

964. At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the Plaintiff State held by the Defendants.

965.　At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

966.　Defendants presented false accounting information and prospectuses to the State

Plaintiff.

967.　Based on these false statements, the Plaintiff State contracted with the Defendants

to invest in the Defendants.

968.　Defendants intentionally concealed its true financial status and health to the

Plaintiff State because if Defendants had not concealed such information, the

Plaintiff State would not have authorized investments in the Defendants.

969.　Had the Defendants not submitted these false and/or fraudulent records and

statements regarding its financial health, the State would not have approved

these claims and/or would not have continued to approve these claims.

970.　As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT FIFTY EIGHT**
**N.J. Stat. Ann. § 2A:32C-3(c)**
**Violation of the New Jersey False Claims Act**
***Conspiracy***

971.　All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

972.　Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

973.    As a result of the knowing and intentional acts of the Defendants, the State

        Plaintiff has been damaged.

**COUNT FIFTY NINE**
**Violation of the New Jersey False Claims Act**
**N.J. Stat. Ann. § 2A:32C-3(g)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to*
*conceal, avoid, or decrease an obligation to pay or transmit money or property to the*
*state or any political subdivision*

974.    All of the preceding paragraphs are reincorporated and realigned by reference,

        herein.

975.    At all times relevant to this Third Amended Complaint, Defendants had a

        contractual obligation to report lending information and property values

        thoroughly and accurately.

976.    At all times relevant to this Third Amended Complaint, Defendants presented

        false lending information and property values to the Plaintiff State.

977.    At all times relevant to this Third Amended Complaint, Defendants had an

        obligation to render true and accurate periodic accountings with respect to the

        property of the State Plaintiff held by the Defendants.

978.    At all times relevant to this Third Amended Complaint, Defendants did render

        periodic accountings with respect to the property of the State Plaintiff held by

        the Defendants.

979.    As alleged above, Defendants knowingly and intentionally failed to report the

        true nature of its financial health and its real estate dealings, and thereby

        presented or caused to be presented false and fraudulent claims for transactions

        and investments rendered on behalf of the State Plaintiff.

980.    The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

981.    Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to wrongfully obtain and

retain State funds.

982.    Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

983.    As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT SIXTY**
**Violation of the North Carolina False Claims Act**
**N.C. Gen Stat. § 1-607(a)(1)**
***Presenting or Causing to Present a False Claim for Payment or Approval***

984.    All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

985.    At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

986.    At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

987.    At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

988.     At all times relevant to this Third Amended Complaint, Defendants did render
periodic accountings with respect to the property of the State Plaintiff held by
the Defendants.

989.     As alleged above, Defendants knowingly and intentionally failed to report the
true nature of its financial health and its real estate dealings, and thereby
presented or caused to be presented false and fraudulent claims for transactions
and investments rendered on behalf of the State Plaintiff.

990.     The false and/or fraudulent claims regarding the value of investments made on
behalf of the State Plaintiff were presented to the State Plaintiff in the periodic
accountings Defendants was required to render pursuant to agreements in place
between the Defendants and the State Plaintiff.

991.     Defendants knowingly and intentionally submitted these false and/or
fraudulent claims regarding transactions in order to obtain and retain State
funds.

992.     Had the Defendants not submitted these false and/or fraudulent claims, the
State would not have approved these claims and/or would not have continued
to approve these claims.

993.     As a result of the knowing and intentional acts of the Defendants, the State
Plaintiff has been damaged.

**COUNT SIXTY ONE**
**Violation of the North Carolina False Claims Act**
**N.C. Gen Stat. § 1-607(a)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

994.  All of the preceding paragraphs are reincorporated and realigned by reference,
      herein.

995.  At all times relevant to this Third Amended Complaint, Defendants had a
      contractual obligation to report lending information and property values
      thoroughly and accurately.

996.  At all times relevant to this Third Amended Complaint, Defendants presented
      false lending information and property values to the Plaintiff State.

997.  At all times relevant to this Third Amended Complaint, Defendants had an
      obligation to render true and accurate periodic accountings with respect to the
      property of the Plaintiff State held by the Defendants.

998.  At all times relevant to this Third Amended Complaint, Defendants did render
      periodic accountings with respect to the property of the State Plaintiff held by
      the Defendants.

999.  Defendants presented false accounting information and prospectuses to the State
      Plaintiff.

1000. Based on these false statements, the Plaintiff State contracted with the Defendants
      to invest in the Defendants.

1001. Defendants intentionally concealed its true financial status and health to the
      Plaintiff State because if Defendants had not concealed such information, the
      Plaintiff State would not have authorized investments in the Defendants.

1002. Had the Defendants not submitted these false and/or fraudulent records and
      statements regarding its financial health, the State would not have approved
      these claims and/or would not have continued to approve these claims.

1003.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT SIXTY TWO**
**Violation of the North Carolina False Claims Act**
**N.C. Gen Stat. § 1-607(a)(3)**
***Conspiracy***

1004.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1005.   Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

1006.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

**COUNT SIXTY THREE**
**Violation of the North Carolina False Claims Act**
**N.C. Gen Stat. § 1-607(a)(7)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to***
***conceal, avoid, or decrease an obligation to pay or transmit money or property to the***
***state or any political subdivision***

1007.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1008.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

1009.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

1010.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1011.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1012.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1013.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1014.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

1015.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1016.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SIXTY FOUR**
**Violation of the Oklahoma False Claims Act**
**Okla. Stat. tit. 63 § 5053.1(B)(1)**

### *Presenting or Causing to Present a False Claim for Payment or Approval*

1017. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1018. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1019. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1020. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1021. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1022. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1023. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1024. Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State funds.

1025. Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1026. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SIXTY FIVE**
**Violation of the Oklahoma False Claims Act**
**Okla. Stat. tit. 63 § 5053.1(B)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records Material to a False Claim*

1027. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1028. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1029. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1030. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

1031. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1032.   Defendants presented false accounting information and prospectuses to the State
Plaintiff.

1033.   Based on these false statements, the Plaintiff State contracted with the Defendants
to invest in the Defendants.

1034.   Defendants intentionally concealed its true financial status and health to the
Plaintiff State because if Defendants had not concealed such information, the
Plaintiff State would not have authorized investments in the Defendants.

1035.   Had the Defendants not submitted these false and/or fraudulent records and
statements regarding its financial health, the State would not have approved
these claims and/or would not have continued to approve these claims.

1036.   As a result of the knowing and intentional acts of the Defendants, the State
Plaintiff has been damaged.


**COUNT SIXTY SIX**
**Violation of the Oklahoma False Claims Act**
**Okla. Stat. tit. 63 § 5053.1(B)(3)**
*Conspiracy*

1037.   All of the preceding paragraphs are reincorporated and realigned by reference,
herein.

1038.   Defendants conspired with numerous entities to prepare and deliver the
inaccurate accounting reports to the State Plaintiff, including accounting firms,
auditors, vendors, lawyers, and other business entities.

1039.   As a result of the knowing and intentional acts of the Defendants, the State
Plaintiff has been damaged.

**COUNT SIXTY SEVEN**
**Violation of the Oklahoma False Claims Act**
**Okla. Stat. tit. 63 § 5053.1(B)(7)**
*Knowingly makes, uses, or causes to be made or used a false record or statement to*
*conceal, avoid, or decrease an obligation to pay or transmit money or property to the*
*state or any political subdivision*

1040.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1041.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

1042.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

1043.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

1044.   At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

1045.   As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

1046.   The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

1047.   Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to wrongfully obtain and

retain State funds.

1048.   Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

1049.   As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.

## COUNT SIXTY EIGHT
### Violation of the Rhode Island State False Claim Act
### R.I. Gen. Laws § 9-1.1-3(a)(1)
### *Presenting or Causing to Present a False Claim for Payment or Approval*

1050.   All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1051.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

1052.   At all times relevant to this Third Amended Complaint, Defendants presented

false lending information and property values to the Plaintiff State.

1053.   At all times relevant to this Third Amended Complaint, Defendants had an

obligation to render true and accurate periodic accountings with respect to the

property of the State Plaintiff held by the Defendants.

1054.   At all times relevant to this Third Amended Complaint, Defendants did render

periodic accountings with respect to the property of the State Plaintiff held by

the Defendants.

1055.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1056.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1057.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

1058.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1059.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SIXTY  NINE**
**Violation of the Rhode Island State False Claim Act**
**R.I. Gen. Laws § 9-1.1-3(a)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

1060.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1061.   At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values thoroughly and accurately.

1062.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1063.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

1064.   At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1065.   Defendants presented false accounting information and prospectuses to the State Plaintiff.

1066.   Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

1067.   Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

1068.   Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

1069.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY**
**Violation of the Rhode Island State False Claim Act**
**R.I. Gen. Laws § 9-1.1-3(a)(3)**
***Conspiracy***

1070.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1071.   Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

1072.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY ONE**
**Violation of the Rhode Island State False Claims Act**
**R.I. Gen. Laws § 9-1.1-3(a)(7)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision***

1073.   All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1074.   At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1075.   At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1076.   At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1077. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1078. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1079. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1080. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

1081. Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1082. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY TWO**
**Violation of the Tennessee False Claims Act**
**Tenn. Code. § 4-18-103(a)(1)**
***Presenting or Causing to Present a False Claim for Payment or Approval***

1083. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1084. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1085. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1086. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1087. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1088. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1089. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1090. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to obtain and retain State funds.

1091. Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued to approve these claims.

1092.  As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY THREE**
**Violation of the Tennessee False Claims Act**
**Tenn. Code § 4-18-103(a)(2)**
***Making, Using, or Causing to be Made or Used False Statements or Records***
***Material to a False Claim***

1093.  All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1094.  At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1095.  At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1096.  At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

1097.  At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1098.  Defendants presented false accounting information and prospectuses to the State Plaintiff.

1099.  Based on these false statements, the Plaintiff State contracted with the Defendants

to invest in the Defendants.

1100. Defendants intentionally concealed its true financial status and health to the

Plaintiff State because if Defendants had not concealed such information, the

Plaintiff State would not have authorized investments in the Defendants.

1101. Had the Defendants not submitted these false and/or fraudulent records and

statements regarding its financial health, the State would not have approved

these claims and/or would not have continued to approve these claims.

1102. As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT SEVENTY FOUR**
**Violation of the Tennessee False Claims Act**
**Tenn. Stat. §71-5-103(a)(3)**
*Conspiracy*

1103. All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1104. Defendants conspired with numerous entities to prepare and deliver the

inaccurate accounting reports to the State Plaintiff, including accounting firms,

auditors, vendors, lawyers, and other business entities.

1105. As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT SEVENTY FIVE**
**Violation of the Tennessee False Claims Act**
**Tenn. Stat. §71-5-103(a)(7)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to***
***conceal, avoid, or decrease an obligation to pay or transmit money or property to the***
***state or any political subdivision***

1106. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1107. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1108. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1109. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1110. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1111. As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1112. The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1113. Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and

retain State funds.

1114.  Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1115.  As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.


**COUNT SEVENTY SIX**
**Violation of the Virginia Fraud Against Taxpayers Act**
**Va. Code §8.01-216.3(A)(1)**
*Presenting or Causing to Present a False Claim for Payment or Approval*

1116.  All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1117.  At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1118.  At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1119.  At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1120.  At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1121.  As alleged above, Defendants knowingly and intentionally failed to report the

true nature of its financial health and its real estate dealings, and thereby

presented or caused to be presented false and fraudulent claims for transactions

and investments rendered on behalf of the State Plaintiff.

1122.  The false and/or fraudulent claims regarding the value of investments made on

behalf of the State Plaintiff were presented to the State Plaintiff in the periodic

accountings Defendants was required to render pursuant to agreements in place

between the Defendants and the State Plaintiff.

1123.  Defendants knowingly and intentionally submitted these false and/or

fraudulent claims regarding transactions in order to obtain and retain State

funds.

1124.  Had the Defendants not submitted these false and/or fraudulent claims, the

State would not have approved these claims and/or would not have continued

to approve these claims.

1125.  As a result of the knowing and intentional acts of the Defendants, the State

Plaintiff has been damaged.


**COUNT SEVENTY SEVEN**
**Violation of the Virginia Fraud Against Taxpayers Act**
**Va. Code §8.01-216.3(A)(2)**
*Making, Using, or Causing to be Made or Used False Statements or Records*
*Material to a False Claim*

1126.  All of the preceding paragraphs are reincorporated and realigned by reference,

herein.

1127.  At all times relevant to this Third Amended Complaint, Defendants had a

contractual obligation to report lending information and property values

thoroughly and accurately.

1128. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1129. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the Plaintiff State held by the Defendants.

1130. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1131. Defendants presented false accounting information and prospectuses to the State Plaintiff.

1132. Based on these false statements, the Plaintiff State contracted with the Defendants to invest in the Defendants.

1133. Defendants intentionally concealed its true financial status and health to the Plaintiff State because if Defendants had not concealed such information, the Plaintiff State would not have authorized investments in the Defendants.

1134. Had the Defendants not submitted these false and/or fraudulent records and statements regarding its financial health, the State would not have approved these claims and/or would not have continued to approve these claims.

1135. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY EIGHT**
**Violation of the Virginia Fraud Against Taxpayers Act**
**Va. Code §8.01-216.3(A)(3)**
*Conspiracy*

1136. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1137. Defendants conspired with numerous entities to prepare and deliver the inaccurate accounting reports to the State Plaintiff, including accounting firms, auditors, vendors, lawyers, and other business entities.

1138. As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

**COUNT SEVENTY NINE**
**Violation of the Virginia Fraud Against Taxpayers Act**
**Va. Code §8.01-216.3(A)(7)**
***Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision***

1139. All of the preceding paragraphs are reincorporated and realigned by reference, herein.

1140. At all times relevant to this Third Amended Complaint, Defendants had a contractual obligation to report lending information and property values thoroughly and accurately.

1141. At all times relevant to this Third Amended Complaint, Defendants presented false lending information and property values to the Plaintiff State.

1142. At all times relevant to this Third Amended Complaint, Defendants had an obligation to render true and accurate periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1143. At all times relevant to this Third Amended Complaint, Defendants did render periodic accountings with respect to the property of the State Plaintiff held by the Defendants.

1144.   As alleged above, Defendants knowingly and intentionally failed to report the true nature of its financial health and its real estate dealings, and thereby presented or caused to be presented false and fraudulent claims for transactions and investments rendered on behalf of the State Plaintiff.

1145.   The false and/or fraudulent claims regarding the value of investments made on behalf of the State Plaintiff were presented to the State Plaintiff in the periodic accountings Defendants was required to render pursuant to agreements in place between the Defendants and the State Plaintiff.

1146.   Defendants knowingly and intentionally submitted these false and/or fraudulent claims regarding transactions in order to wrongfully obtain and retain State funds.

1147.   Had the Defendants not submitted these false and/or fraudulent claims, the State would not have approved these claims and/or would not have continued to approve these claims.

1148.   As a result of the knowing and intentional acts of the Defendants, the State Plaintiff has been damaged.

## **PRAYER**

WHEREFORE, Plaintiff, acting on its own behalf and on behalf of the United States and the Plaintiff States, demands and prays that this Court enter judgment against Defendants as follows:

A.   That Defendants be found to have violated and be enjoined from future violations of the federal False Claims Act, the New York False Claims Act, the California False Claims Act, the Delaware False

Claims Act, the District of Columbia False Claims Act, the Florida False Claims Act, the Hawaii False Claims Act, the Illinois False Claims Act, the Indiana False Claims Act, the Massachusetts False Claims Act, the Minnesota False Claims Act, the Montana False Claims Act, the Nevada False Claims Act, the New Hampshire False Claims Act, t h e  N e w J e r s e y  F a l s e  C l a i m s  A c t ,  t h e  N e w  M e x i c o  F a l s e C l a i m s  A c t ,  the North Carolina False Claims Act, the Oklahoma False Claims Act, the Rhode Island State False Claim Act, the Tennessee False Claims Act, and the Virginia Fraud Against Taxpayers Act.

B.   That Defendants be found to have violated and enjoined from future violations of the provisions against conspiracy to defraud the governments as found in the federal  False Claims Act, the New York False Claims Act, the California False Claims Act, the Delaware False Claims Act, the District of Columbia False Claims Act, the Florida False Claims Act, the Hawaii False Claims Act, the Illinois False Claims Act, the Indiana False Claims Act, the Massachusetts False Claims Act, the Minnesota False Claims Act, the Montana False Claims Act, the Nevada False Claims Act, the New Hampshire False Claims Act, T h e  N e w  J e r s e y  F a l s e  C l a i m s A c t ,  t h e  N e w  M e x i c o  F a l s e  C l a i m s  A c t ,  the North Carolina False Claims Act, the Oklahoma False Claims Act, the Rhode Island State False Claim Act, the Tennessee False Claims Act, and the Virginia Fraud Against Taxpayers Act.

C.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained

because of the false or fraudulent claims caused to be made by the Defendants, plus the maximum civil penalty for each violation of 31 U.S.C. §3729.

D.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the false or fraudulent records and/or statements the Defendants caused to be made, plus the maximum civil penalty for each violation of 31 U.S.C. §3729.

E.   That Planitiff-Relator Madsen be awarded the maximum amount allowed pursuant to §3730(d), and all relief to which they are entitled pursuant to §3730(h) of the False Claims Act.

F.   That this Court enter judgment against Defendants for the maximum amount of damages sustained by each State or District because of the false or fraudulent claims caused to be made by the Defendants, plus the maximum civil penalty for each violation of the California False Claims Act, the Delaware False Claims Act, the District of Columbia False Claims Act, the Florida False Claims Act, the Hawaii False Claims Act, the Illinois False Claims Act, the Indiana False Claims Act, the Massachusetts False Claims Act, the Minnesota False Claims Act, the Montana False Claims Act, the Nevada False Claims Act, the New Hampshire False Claims Act, The New Jersey False Claims Act, the New Mexico False Claims Act, the North Carolina False Claims Act, the Oklahoma False Claims Act, the Rhode Island State False Claim Act, the Tennessee False Claims Act, and the Virginia Fraud Against Taxpayers Act.

G. Plaintiff-Relator Madsen requests, on behalf of himself, individually, that he be awarded the relief to which he is entitled pursuant to 31 U.S.C. 3730(h)(1) and (2), including reinstatement with the same seniority status such as he would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for special damages he sustained as a result of the discrimination, litigation costs and reasonable attorneys' fees, and all other relief necessary to make him whole;

H. That Plaintiffs be awarded the maximum amount allowed pursuant to all relief to which they are entitled pursuant to said laws.

I. That Plaintiffs be awarded all costs of this action, including expert witness fees, attorneys' fees, and court costs.

J. All further relief as this Court deems just and proper.

## TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues.

Respectfully Submitted,

LINDA J. STENGLE, ESQUIRE
The Arras Group, Inc.
New York Bar No.:   4848958
SDNY Bar No.: LS3756
9 Lenswood Drive
Boyertown, PA 19512
(610)367-1604

219

BRIAN P. KENNEY, ESQUIRE
Kenney & McCafferty, P.C.
1787 Sentry Parkway West,
Suite 410, Building 18
Blue Bell, PA 19422
Date: February 23, 2012          (215)367-4333